## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **DENNIS MAZZETTI, individually and on behalf of D.M. as the "next friend" of D.M. a minor,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY ("DCP&P") (formerly Division of Youth and Family Services), et al.,**<br><br>**Defendants.** | Civ. No. 14-8134 (KM) (MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Dennis Mazzetti, brings this action alleging a bevy of constitutional violations committed during the process of terminating his parental rights over his child, D.M., and later, when the child was in the custody of Mazzetti's mother. Defendants have moved to dismiss the complaint. (ECF No. 15) For the reasons set forth below, the motion will be for the most part GRANTED, but in part DENIED.

## I.   BACKGROUND

### A.   Parties

This action involves 11 named defendants:

- DCP&P (formerly Division of Youth & Family Services ("DYFS"), a New Jersey child protection and welfare agency within the Department of Children and Families;

- Governor Christopher J. Christie in his individual and official capacities;

- Lisa Von Pier in her official capacity as Director of DCP&P,

- Allison Blake, the Commissioner of the Department of Children and Families, in her individual and official capacities;

- Judge Bonnie J. Mizdol, the presiding judge of the family division for the Bergen County Vicinage of the New Jersey Superior Court, in her individual and official capacities;

- Judge Margaret Foti, a judge of the family division for the Bergen County Vicinage of the New Jersey Superior Court, in her individual and official capacities;

- The Honorable Virginia Long, former Associate Justice of the New Jersey Supreme Court, in her individual and official capacities;

- Deputy Attorney General Ellen Buckwalter in her individual capacity;

- Bergen County Prosecutor John Molinelli in his individual and official capacity;

- Kimberly Roberts, a caseworker at DCP&P, in her individual capacity; and

- Erica Zapata, a caseworker at DC&P, in her individual capacity.

(Compl. ¶¶ 5-21)

### B.   Relevant Facts & Procedural History

The New Jersey courts terminated Mazzetti's parental rights over his son, D.M., and that decision was affirmed on appeal. The complaint alleges a narrative that diverges from the factual findings of the state court as recited by the appellate opinion affirming the termination decision. *Compare* Compl. *with N.J. Div. of Youth & Family Servs. v. D.M. (In re D.M.)*, Dkt. No. A-2509-09T3, 2012 N.J. Super. Unpub. LEXIS 120 (App. Div. Jan. 18, 2012). Mazzetti, for example, alleges a vast conspiracy to deprive him of his parental rights, while the appellate opinion portrays a man with "a distorted reality" who was "unable or unwilling to secure adequate housing for the child" and lacked the ability to

2

"provide even a minimal degree of parental care." *In re D.M.*, at *6, 11-12 (quoting the trial court's findings). For purposes of this motion to dismiss only, I consider the facts as set forth in Mazzetti's complaint.

D.M. was born on March 11, 2007, to Mazzetti, the father, and C.M., the mother. The child was born with cocaine in his system. Following his release from the hospital, D.M. was placed in a foster home. "Several months after" his birth, D.M. was placed in the care of Mazzetti's mother, Linda Mazzetti. She eventually adopted D.M. (*See* Compl. ¶ 25, 27, 40, 55, 95)[1]

At some point, DCP&P sought to terminate Mazzetti's parental rights based on the best interests of the child. Around the time of the termination proceedings, Mazzetti was suffering from an infected hernia, which "may" have rendered him permanently disabled. He could not financially provide for D.M. without assistance from Linda Mazzetti, and DCP&P refused or failed to provide Mazzetti or his family employment or housing services. Mazzetti alleges that he never abused or neglected D.M. He completed every parenting course and passed every drug test but one, the results of which he says were falsified.[2] During the termination proceedings, however, DCP&P testified that Mazzetti "failed . . . to plan for the future [of D.M.] although physically and financially able to do so" and "abandoned his minor child to the care of others." (*Id.* ¶¶ 64-68, 73, 76, 79-84)

Mazzetti's rights over D.M. were terminated. He appealed. Someone at DCP&P told Linda Mazzetti that her son could have unfettered visitation rights if he dropped his appeals. (*Id.* ¶ 83) The Appellate Division affirmed the lower court's denial of Mazzetti's parental rights on January 18, 2012. Mazzetti

---

[1]   C.M. voluntarily relinquished her parental rights. *In re D.M.*, at *1

[2]   As described by the state appellate court, Mazzetti "refused for several months to comply with the Division's reasonable request and the trial court's order that he submit to hair follicle drug testing even when his right to visitation hung in the balance." *Id.* at *6. The court also noted that when he did "finally submit[] to hair follicle drug testing months after it was sought, he tested positive for cocaine." *Id.* at n. 2. Presumably that is the allegedly "falsified" result.

sought review from the New Jersey Supreme Court and then the United States Supreme Court. Those petitions were denied in May and October, 2012. *See N.J. Dep't of Children and Families, Div. of Youth and Family Servs. v. D.M.*, 210 N.J. 218 (2012); *D.M. v. N.J. Dep't of Youth & Family Servs.*, 133 S. Ct. 571 (2012). In the interim, on August 23, 2012, Mazzetti filed a federal court complaint that substantially overlaps the subject matter of this action.[3]

In January 2014, DCP&P opened a case for D.M, which allegedly remains open. Around the same time, D.M. was improperly prescribed Ritalin while under DCP&P's supervision. (Comp. ¶¶ 108, 109)

On or about June 27, 2014, Linda Mazzetti was hospitalized. Mazzetti assumed caregiving responsibilities for D.M. On July 1, 2014, DCP&P removed D.M. from the care of Linda Mazzetti with the assistance of DCP&P caseworker Kimberly Roberts. The removal was based on information provided by Deputy Attorney General Ellen Buckwalter who, in a Verified Complaint, stated that Linda Mazzetti "was 'no longer able to care for [D.M.] due to her hospitalization." (*Id.* ¶¶ 125-129, 134, 143)

In the process of seizing D.M., Roberts told Mazzetti that "DYFS could do whatever it wants to do without repercussion, that [Mazzetti] will never see his son again, and that there is nothing [Mazzetti] could do about it." Prosecutor Molinelli failed to prosecute Roberts for her involvement in the seizure, even though a municipal court judge found probable cause to issue a criminal complaint. (*Id.* ¶¶ 123, 174-75)

"Without subject matter or personal" jurisdiction, Superior Court Judge Mizdol terminated Mazzetti's visitation rights on July 3, 2014. On July 17, 2014, Mazzetti petitioned Governor Chris Christie to investigate DCP&P,

---

[3]     That case, *Mazzetti v. N.J. DC.P.P.*, Civ. No. 12-5347, was assigned to District Judge Hayden. It has already been the subject of an appeal to the United States Court of Appeals for the Third Circuit. *Mazzetti v. Wood*, 573 F. App'x 165 (3d Cir. 2014).

and to investigate and impeach Judge Mizdol. Governor Christie did neither. (*Id.* ¶¶ 138-142, 152-54)

In August 2014, DCP&P misrepresented Mazzetti's relationship to D.M. to the Child Placement Review Board ("CPRB"). Mazzetti was not given notice of the meeting, and only Erica Zapata, a DCP&P caseworker, "appears to have attended." (*Id.* ¶¶ 157-59)

On or about September 7, 2014, Mazzetti filed a complaint to the Supreme Court of New Jersey Advisory Committee on Judicial Conduct ("ACJC"), seeking an investigation of Judge Mizdol's conduct. A month later, ACJC, of which defendant the Honorable Virginia Long is Chairperson, found that there was "no basis to charge Judge Mizdol with judicial misconduct." (Compl. ¶¶ 155-56)

On September 11, 2014, Linda Mazzetti executed a codicil to her will in which she appointed her son, Mazzetti, as D.M.'s guardian. Two days later, Linda Mazzetti died. DCP&P allowed D.M. to be present for only one hour of the wake and funeral. He was not permitted to spend any additional time with Mazzetti or his family. Mazzetti applied for an emergent order. The Appellate Division ruled sometime later that Mazzetti had standing to move to vacate the termination of his parental rights based on changed circumstances. (*Id.* ¶¶ 163-64, 167, 191)

Judge Margaret Foti, who inherited Mazzetti's case from Judge Mizdol, denied the motion to vacate on October 31, 2014. She allegedly also refused to allow Mazzetti access to psychological evaluations, denied him counsel, and refused to allow him to introduce evidence or participate in a "Best Interests of the Child Hearing." Judge Foti also failed to decide Mazzetti's motion for dismissal for lack of jurisdiction and the right to intervene. (*Id.* ¶¶ 121, 163, 170)

Since Linda Mazzetti's death, D.M. has been in foster care. (*Id.* ¶¶ 164, 240, 289)

### C.    Claims

Mazzetti filed this federal complaint on December 31, 2014. The gist of it is that defendants have denied him his parental rights and retaliated against him for persisting in his appeals and federal civil rights law suits. Mazzetti avers that his case is but one facet of a DCP&P-spearheaded scheme "to place children in foster homes to obtain more funding from the State and the United States Department of Health and Human Services" and "to increase DYFS instigated adoptions." (*Id.* ¶¶ 210, 230-92)

The complaint contains eight counts:

1. Section 1983 claim of violations of the Fourth and Fourteenth Amendments by DCP&P, Von Pier, Blake, Judge Mizdol, Judge Foti, and Governor Christie, for failure to properly promulgate rules and to supervise, train, and discipline those who committed abuses of process during their investigation of allegations of child abuse. Count 1 seeks an injunction requiring defendants to formulate explicit instructions and policies against abuse of process.

2. Section 1983 and 1986 claims of violations of the Sixth and Fourteenth Amendments by the defendants named in Count 1 for a policy or custom of improper hiring and inadequate training that led to abuses of process and deliberate indifference to the rights of persons including Mazzetti. Count 2 requests the same injunctive relief as Count 1.

3. Section 1985 claim of conspiracy by DCP&P, Governor Christie, Judges Mizdol and Foti, Deputy Attorney General Buckwalter, Roberts, Zapata, Justice Long, and Prosecutor Molinelli to commit abuses of process. Count 3 requests $10 million in damages, $50 million in punitive damages, fees and costs, interest, and any other appropriate relief.

4. Section 1983 claim by the defendants named in Count 3 for violations of Mazzetti and D.M.'s rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments for policies, practices, acts, and omissions that excessively interfered with Mazzetti's fundamental rights to privacy and freedom to raise a family. Count 4 requests the same relief as Count 3.

5. Section 1983 claim by the same defendants named in Count 3 for violations of Mazzetti and D.M.'s rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments for depriving Mazzetti of his due process rights, his rights to be free from excessive interference with family relationships, and his rights to speak freely about the defendants' conduct. Mazzetti requests the same relief as Count 3.

6. Section 1983 claim by the defendants named in Count 3 for violations of Mazzetti and D.M.'s rights under the First and Fourteenth Amendments for retaliating against Mazzetti's opposition to defendants' unlawful conduct and depriving him of equal protection of the law. Count 6 requests the same relief as Count 3.

7. Claim of violations of Mazzetti's rights under Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131-12165, by the defendants named in Count 3 for failing to provide Mazzetti with services to protect his rights and using his disability as a means to deprive him of those rights. Count 7 requests the same relief as Count 3.

8. A habeas corpus petition under 28 U.S.C.§ 2254. Mazzetti demands that defendants either demonstrate lawful jurisdiction and custody over D.M or return D.M. to his custody.

**D.     This Motion to Dismiss**

On April 1, 2015, defendants moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. They argue that the complaint as a whole should be dismissed on jurisdictional grounds. Failing that, they assert immunity grounds specific to individual defendants. Failing that, they suggest that various counts of the complaint fail to state a claim. I have analyzed the claims in that order.

Sections II and III of this Opinion discuss jurisdiction and the merits in relation to Counts 1–7. Count 8, a habeas petition, is discussed separately in Section IV. The net result is that, except for the First Amendment retaliation claim (Count 6) as against defendants Zapata and Roberts, the complaint will be dismissed.

## II.   SUBJECT MATTER JURISDICTION

A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) may be raised at any time. *Iowana v. Ford Motor Co.*, 67 F. Supp. 2d 424, 437-38 (D.N.J. 1999). Rule 12(b)(1) challenges may be either facial or factual attacks. *See* 2 Moore's Federal Practice § 12.30[4] (3d ed. 2007); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). A facial challenge asserts that the complaint does not allege sufficient grounds to establish subject matter jurisdiction. *Iwanowa*, 67 F. Supp. 2d at 438. A court considering such a facial challenge assumes that the allegations in the complaint are true, and may dismiss the complaint only if it nevertheless appears that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction. *Cardio–Med. Assoc., Ltd. v. Crozer–Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983); *Iwanowa*, 67 F. Supp. 2d at 438. "With respect to 12(b)(1) motions in particular, '[t]he plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right.'" *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 244 (3d Cir. 2012) (quoting *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007)). *See generally Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (discussing distinctions between facial and factual attack).

### A.   Standing

#### 1.   Injunctive relief

Defendants argue that Mazzetti lacks standing to pursue the injunctive relief he seeks. Mazzetti, recall, requests "an order requiring [an] explicit instruction and policy be made requiring DYFS workers to refrain from abuse of process." (Compl. ¶¶ 240, 247) But Mazzetti's parental rights have already been terminated, and he does not identify any likelihood that he would be subject to further abuses of process by DCP&P. He therefore lacks standing.

8

To have constitutional standing, a plaintiff must plausibly allege that (1) that he has "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent', not 'conjectural' or 'hypothetical'"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." *In re Schering-Plough*, 678 F.3d at 244 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff seeking relief must plausibly allege that *he* is at risk of future harm that an injunction would address. *See Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding that citizen seeking to enjoin police chokeholds lacked standing absent evidence of a "real" and "immediate" threat that he would be subjected to the practice again).

Mazzetti's parental rights as to D.M. were terminated years ago— unconstitutionally, he says. But that alone does not give him standing to seek an injunction to prevent DCP&P from continuing to engage in similar allegedly unconstitutional procedures *in the future*. *See Lyons*, 461 U.S. at 102 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.") (quoting *O'Shea v. Littleton*, 414 U.S. 448, 495-96 (1974); *see also Davis v. Thornburgh*, 903 F.2d 212, 221 (3d Cir.), *cert denied*, 498 U.S. 970 (1990) (holding that a parent lacked standing to pursue declaratory and injunctive relief to challenge the procedures that deprived her of her parental rights after those rights had been terminated). And looking forward, Mazzetti does not allege that DCP&P's policies and practices will be marshaled against him in the future to deprive him of his parental rights. Mazzetti's claimed injury, then, is not "real and immediate" but remote and abstract.

Nor is his grievance likely to be redressed by the injunctive relief he seeks. "Once the termination order was entered," he "could longer demonstrate that []he had suffered an injury 'likely to be redressed by a favorable decision.'" *Davis*, 903 F.2d at 220 (quoting *Simon v. Eastern Kentucky Welfare Rights*

9

*Organization*, 426 U.S. 26, 38 (1976)). There may be individuals who would benefit from the reform of DCP&P policies and practices that Mazzetti seeks. Mazzetti, however, is not one of them, and he cannot seek relief on their behalf. Because Mazzetti alleges no threatened future injury to himself, his complaint fails to set forth standing to sue for injunctive relief.

Counts 1 and 2 of the Mazzetti's complaint are therefore DISMISSED for lack of subject matter jurisdiction.[4]

### 2.    Third party standing on behalf of D.M.

Mazzetti also alleges that D.M.'s rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments were violated, and requests an injunction (Counts 1-2) and damages (Counts 3-6) on D.M.'s behalf. As a matter of constitutional or prudential standing, Mazzetti cannot bring section 1983 claims on behalf of D.M.[5]

Mazzetti's relationship to D.M. has been severed, and his parental rights over D.M. extinguished, as a matter of law. Such a drastic order must be distinguished from, *e.g.*, a mere award of custody to one or both parents. *See In re Adoption of Children by L.A.S.*, 134 N.J. 127, 132 (1993) ("Termination of parental rights—in contrast to the loss of custody of one's children—permanently severs the relationship between children and their biological parents."). When a court finds that termination of parental rights is in the best interests of the child, DCP&P becomes "the legal guardian of the child for all purposes." N.J. Stat. Ann. § 30:4C-20. The state court order terminating Mazzetti's parental rights—having survived the scrutiny of two New Jersey appellate courts and the United States Supreme Court—is valid and final. The

---

[4]    Counts 1 and 2, now dismissed, are the only counts in which defendants Von Pier and Blake are named. They will therefore be dismissed from the case.

[5]    No party has addressed whether Mazzetti has standing to bring civil rights claims on behalf of D.M. Because the issue may implicate the Court's subject matter jurisdiction, I have an obligation to address it here. *See Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76–77 (3d Cir. 2003).

Full Faith and Credit statute, 28 U.S.C. § 1738, therefore obligates me to give it "the same effect as would the adjudicating state," even in a Section 1983 suit for damages brought in this federal court. *Davis*, 903 F.2d at 220.[6] When his parental rights over D.M. are removed from the calculus, Mazzetti cannot allege how *he* has been harmed by these alleged violations of *D.M.'s* rights, or how that harm is likely to be redressed by a favorable decision.

Mazzetti seeks do what he has already been adjudicated unfit to do: to exercise control and authority over D.M.'s legal interests. To permit standing in a case like this would run contrary to the "special solicitude" given to "state interests 'in the field of family and family-property arrangements.'" *Davis*, 903 F.2d at 222. It would, in other words, allow an end-run around a valid state court judgment. "Unless and until that decree is vacated or modified by the state courts," Mazzetti lacks "the legal capacity to assert or control any of the rights of [D.M.] in this or any other court." *Crawford v. Wash. Cty. Children & Youth Servs.*, 2:06cv1698, 2008 U.S. Dist. LEXIS 6416, at *14-16 (W.D. Pa. Jan. 29, 2008) *summ. jmt. granted*, 2009 U.S. Dist. LEXIS 21635 (W.D. Pa. Mar. 12, 2009), *aff'd*, 353 F. App'x 726, 730 (3d Cir. 2009) ("[T]he district court

---

[6]    Drawing on Judge Becker's dissent in *Davis*, at least two courts have reasoned that a parent whose rights have been terminated has standing to bring a claim on behalf of their alienated children if they are "challenging the specific state court order terminating [their] parental rights." *Faison v. Sex Crimes Unit*, 845 F. Supp. 1079, 1082-83 (E.D. Pa. 1994); *see also Pelino v. Hens-Greco*, Civ. No. 16-1140, 2017 U.S. Dist. LEXIS 8684 (W.D. Pa. Jan. 23, 2017). The argument, it seems, is that a state "cannot conclusively eliminate [the parent's] interest [in the child] if it is those procedures that she is challenging." *Davis*, 903 F.2d at 228 (Becker, J. dissenting); *Faison*, 845 F. Supp. at 1082-83; *Pelino*, 2017 U.S. Dist. LEXIS 8684, at *7. That is certainly hard to square with the *Rooker-Feldman* doctrine, discussed *infra*, especially since the plaintiffs in *Davis* and *Faison* both sought orders *reinstating* their parental rights. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (ruling that federal courts lack jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments before by the district court proceedings commenced and inviting district court review and rejection of those judgments"). Mazzetti, at any rate, *has* standing to seek damages for the alleged deprivation of *his* constitutional rights by DCP&P policies and procedures. In light of the state court order terminating Mazzetti's rights over D.M., those are the only actual injuries likely to be redressed by a favorable decision that have been demonstrated here.

properly concluded that, to the extent Appellants appear to raise claims on behalf of [the child], they lack standing to assert such claims as their parental rights were severed.").

Apart from the bedrock Article III "case or controversy" limitations on standing, there are also prudential limitations on the exercise of federal jurisdiction over third-party claims. A "'litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" *Pa. Psychiatric Soc'y v. Green Spring Health Servs.* 280 F.3d 278, 288 (3d Cir. 2002) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). This rule, however, permits an exception: "Where rightholders are unable to raise their own rights and their relationship with the plaintiff suggests an identity of interests," a plaintiff may be permitted to assert a third party's rights. *Amato v. Wilentz*, 952 F.2d 742, 748 (3d Cir. 1991). To do so, "1) the plaintiff must suffer injury; 2) the plaintiff and the third-party must have a 'close relationship'; and 3) the third party must face some obstacles that prevent it from pursuing its own claims." *Pa. Psychiatric Soc'y,* 280 F.3d at 288-89.

As noted above, Mazzetti has not shown that he personally has suffered an actual injury as a result of violation of D.M.'s rights. *See Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 189 (3d Cir. 2006) ("Whether asserting first party standing or third party standing, a plaintiff must state an injury in fact.") But even if we assume away the injury-in-fact requirement, Mazzetti still has not shown that he has a sufficiently close relationship to D.M. to allow him to assert claims on D.M.'s behalf. It is not enough that Mazzetti is D.M.'s biological father. *Amato*, 952 F.2d at 751-52 ("A close personal relationship is neither necessary nor sufficient for third-party standing.") Mazzetti instead must show that he can "operate 'fully, or very nearly, as effective a proponent'" of D.M.'s rights as D.M. himself. *Pa Psychiatric Soc'y*, 280 F.3d at 289 (quoting *Powers*, 499 U.S. at 413)); *Amato*, at 752 ("The key aspects of the 'relationship' prong are . . . a common link to the right asserted, consistency of the parties'

interests, and effective advocacy—not the intimacy of the relationship per se.") He has not done that here.

By definition, Mazzetti, whose relationship with D.M. has been completely severed for good cause, is no better position to advocate on D.M.'s behalf than a member of the public generally. The state appellate opinion upholding the termination of Mazzetti's parental rights suggests that he is actually in a worse position. By strong implication, Mazzetti's interest in securing custody over D.M. is not in D.M.'s best interest, and if granted would undermine a more general interest in familial stability and security. And while Counts 1-7 do not seek a reinstatement of Mazzetti's parental rights, they essentially rehash the claims that Mazzetti asserted, and ultimately lost, in the state courts.

Nor is there any "obstacle" to the assertion of D.M.'s rights. Granted, D.M., like any minor, cannot assert his own claims, but he does not lack a champion. D.M. is now in the custody of a foster parent, who is not alleged to be part of the scheme to deprive Mazzetti of his rights. (Compl. ¶ 240). That foster parent is the person who would have standing to bring claims on behalf of D.M. if, as Mazzetti contends, the child was injured by the defendants' actions. *See* Fed. R. Civ. P. 17(c).[7]

Mazzetti cannot demonstrate that he is a necessary, desirable, or even appropriate proponent of D.M.'s rights. To the extent that Mazzetti's complaint advances third-party claims on D.M.'s behalf, then, it is DISMISSED for lack of standing.

### B.    *Rooker-Feldman*

Defendants assert that Mazzetti's complaint "is a thinly veiled attempt to collaterally appeal the New Jersey Superior Court's termination of his parental rights." (Def. Br. 16) Therefore, they say, it must be dismissed for lack

---

[7]     Mazzetti's closely related claim to sue as D.M.'s "next friend" is discussed in Section IV, *infra*.

of jurisdiction under the *Rooker-Feldman* doctrine. *See generally Rooker v. Fidelty Trust Co.*, 263 U.S. 413, 416 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983). I will deny those portions of the motions. State court findings will surely have relevance here; claim or issue preclusion, for example, may come into play at a later stage. But Counts 1-7 do not, or at least do not solely, seek to directly invalidate the state court judgment by reversing the termination of Mazzetti's rights as a parent.[8]

The *Rooker-Feldman* doctrine prohibits federal courts from exercising jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered by the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). In the Third Circuit, *Rooker-Feldman* bars clams in federal court if: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir 2010). The doctrine does not apply, however, even "[i]f the matter was previously litigated, as long as the federal plaintiff present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . ." *Id.* Post-*Exxon*, a court must be cautious in applying *Rooker-Feldman* where the federal claims do not directly clash with the state claims, but are merely "intertwined" with them. *See also Gary v. Braddock Cemetery*, 517 F.3d 195, 200 n. 5 (3d Cir. 2008)) (advising caution in employing pre-*Exxon* Third Circuit precedent under *Rooker–Feldman*).

Counts 1 and 2 have already been dismissed of lack of standing. For completeness, however, I note that they seek forward-looking injunctive relief,

---

[8]    Count 8 perhaps does, but that habeas claim will be dismissed for reasons explained in Part IV, *infra*.

not reversal of a past state court judgment, and hence do not implicate *Rooker-Feldman*. Counts 3–7 request damages for alleged abuses of process and violations of constitutional and civil rights by DCP&P, its employees, and state officials. Those counts do not directly assert injuries caused by the state court judgment terminating parental rights; nor do they explicitly ask this Court to overturn that judgment. True, these claims, if granted, might tend to undermine the state court's conclusions, but would not require that they be overruled. *Great W. Mining*, 615 F.3d at 166, 173 (holding that if plaintiffs could prove that constitutional violations precipitated an adverse state court decision, and that an award of damages would not require overruling that decision then *Rooker-Feldman* does not bar their claim); *see also B.S. v. Somerset Cnty.*, 704 F.3d 250, 260 (3d Cir. 2013) (holding that injuries traceable to defendants' actions, rather than the resulting state court orders themselves, are not barred by *Rooker-Feldman*).

I therefore DENY the motion to dismiss on *Rooker-Feldman* grounds.[9]

---

[9]    Defendants alternatively contend that I should dismiss the complaint based on the federalism-based abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). *Younger*, they say, bars Mazzetti's claims because he alleges that there are ongoing proceedings in the New Jersey courts concerning his attempts to vacate the termination order and assume guardianship of D.M. I disagree.

    As explained in Part II.B., *supra*, Mazzetti does not seek to enjoin the current state court proceedings, but rather to enjoin future abuses of process by defendants—relief he in any event lacks standing to seek. *See* Part II.A.1., *supra. See also Marran v. Marran*, 376 F.3d 143, 154-55 (3d Cir. 2004) ("A federal court will only consider <u>Younger</u> abstention when the requested *equitable* relief would constitute federal interference in state judicial or quasi-judicial proceedings.") (emphasis in original) (quoting *Marks v. Stinson*, 19 F.3d 873, 883 (3d Cir. 1994)). And *Younger* abstention on the basis of damages claims is on shaky legal ground. *Id.* at 155 ("These cases [*Deakins v. Monaghan*, 484 U.S. 193, 202 (1988) and *Quakenbush v. Allstate Ins. Co.*, 517 U.S. 706, 719 (1996)] seem to indicate that abstention under *Younger* principles is not proper when damages are sought.")

    At any rate, as explained *infra*, there is only one claim for damages, against Zapata and Roberts, that survives the defendants' barrage of jurisdictional and immunity arguments. The proceedings underlying the termination of Mazzetti's parental rights—in which Zapata and Roberts played no part—ran their course years ago. There is no risk that a judgment in favor of Mazzetti as against these defendants

### C.    Eleventh Amendment and "Persons" Under § 1983

Defendants argue that they are immune from suit under the Eleventh Amendment. The Eleventh Amendment to the Constitution guarantees the states immunity from certain claims: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Despite the seemingly limited scope of its wording, the Eleventh Amendment has long been held to incorporate a more general principle of sovereign immunity that bars citizens from bringing suit against any state in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). The Eleventh Amendment, as a bar to suit, is of jurisdictional stature.

In general, Eleventh Amendment immunity extends to state agencies and state officials in their official capacities. In doubtful cases, the Court will analyze several factors to determine whether the state is the real party in interest. *See Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659-60 (3d Cir. 1989). Eleventh Amendment immunity is subject to three exceptions: "(1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law." *Id.* No such exception applies here, however, so I will GRANT the motion to dismiss as to DCP&P, which is indisputably a State agency, and to the individual defendants insofar as they have been sued for damages in their official capacities.

---

will interfere in whatever matters may still be pending in New Jersey probate or superior court.

### 1.   Damages under §§ 1983, 1985, & 1986 (Counts 3-6)

Counts 3, 4, 5, and 6 of the complaint seek damages under 42 U.S.C. §§ 1983, 1985, and 1986. Section § 1983 provides:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (emphasis added).

As to Section 1983 in particular, there is another issue that is parallel to, and customarily analyzed together with, Eleventh Amendment immunity. I refer to the issue of who or what is a suable "person" under section 1983. A state and its departments are not considered "persons" amenable to suit under section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 67-70 (1989). Also barred are section 1983 suits for damages against "governmental entities that are considered 'arms of the state' for Eleventh Amendment purposes," which are "no different from a suit against the State itself."[10] *Id.* at 70-71. State officials, sued in their official capacities, are likewise not "persons" subject to a damages suit under section 1983. *Will*, 491 U.S. at 71 n.10; *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).

It is well-established that DCP&P (formerly DYFS) is an arm of the State of New Jersey, and as such is immune from suit. See *Howard v. N.J. Div. of Youth and Family Servs.*, 398 F. App'x 807, 811-812 (3d Cir. 2010); *see also Mammaro v. The N.J. Div. of Child Permanency & Prot.*, No. 13-CV-6483 FLW, 2015 U.S. Dist. LEXIS 5321, at *4-5 (D.N.J. Jan. 15, 2015), *rev'd on other*

---

[10]    Logically, the same analysis applies to sections 1985 and 1986, which were passed along with section 1983 as part of the Civil Rights Act of 1871. *See Quern v. Jordan*, 440 U.S. 332, 342 (1979) (the Civil Rights Act of 1871 did not abrogate the states' sovereign immunity); *Muhammad v. Dempsey*, No. 11-CV-350, 2011 U.S. Dist. LEXIS 118867, at *3 (M.D. Pa. Oct. 14, 2011) *aff'd*, 531 F. App'x 216 (3d Cir. 2013).

*grounds*, 814 F.3d 164 (3d Cir. 2016); *Love v. N.J. Div. of Youth & Family Servs.*, No. 07-CV-3661 JEI, 2010 U.S. Dist. LEXIS 73977, at *2 (D.N.J. July 22, 2010) (collecting cases). Mazzetti offers no rationale under which this Court could or should depart from these holdings. As to DCP&P, I will GRANT the motion to dismiss Counts 3-6 on Eleventh Amendment and § 1983 "person" grounds.

As to the remaining individual defendants, these immunity principles have less bite. Mazzetti sues Governor Christie, Judge Foti, Judge Mizdol, Justice Long, and Prosecutor Molinelli for damages in both their official and personal capacities. Deputy Attorney General Buckwalter, Zapata, and Roberts are sued in their personal capacities only. A state official sued in his or her personal capacity is a "person" amenable to suit under section 1983, and does not enjoy Eleventh Amendment protection.[11] *Hafer v. Melo,* U.S. 21, 30-31 (1991). And an award of damages from an individual defendant, as opposed to the public treasury, is a "permissible remedy in some circumstances." *Scheuer v. Rhodes,* 416 U.S. 232, 238 (1974). Thus these defendants, insofar as they are sued in their personal capacities, are not immune under the Eleventh Amendment and are amenable to suit as "persons."

The motions to dismiss Counts 3–6 on these grounds are therefore GRANTED as to DCP&P and the individuals sued in their official capacities, and DENIED as to the individuals sued in their personal capacities.

### 2.    ADA (Count 7)

Mazzetti also sues DCP&P, Governor Christie, Judge Foti, Judge Mizdol, Justice Long, Deputy Attorney General Buckwalter, Prosecutor

---

[11]    Members of the New Jersey state judiciary stand in the shoes of the state and are entitled to the same Eleventh Amendment protection against official-capacity claims. *See Robinson v. New Jersey Mercer Cty. Vicinage-Family Div.*, 514 F. App'x 146, 149 (3d Cir. 2013); *Dongon v. Banar*, 363 F. App'x 153, 155 (3d Cir. 2010). Justice Long is now retired, but she is the Chairperson of the ACJC. Members of that entity are also entitled to Eleventh Amendment immunity. *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009).

Molinelli, Roberts, and Zapata under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Mazzetti alleges that he "may have become permanently disabled" as a result of an infected hernia and that he was refused unidentified "services to protect his civil rights." (Compl. ¶¶ 66, 68, 280-284)

If Mazzetti's Title II claim is to survive Eleventh Amendment immunity, it must be because Congress, in enacting the ADA pursuant to its powers under Section 5 of the Fourteenth Amendment, abrogated that immunity. "Title II of the ADA validly abrogates state sovereign immunity insofar as it creates a private cause of action for damages against the states for conduct that *actually* violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151 (2006) (emphasis in the original). For borderline claims, a fact-intensive analysis may be required in order to determine whether immunity has been abrogated for purposes of Title II. *See Bowers v. National Collegiate Athletic Ass'n*, 475 F.3d 524, 554-56 (3d Cir. 2007).[12]

Mazzetti has not identified which aspects of defendants' conduct violated Title II or the Fourteenth Amendment. To the contrary, he basically alleges that everyone played some role in depriving him of all of his civil and constitutional rights. Defendants, moreover, have not briefed the issue of their sovereign immunity for Mazzetti's particular Title II claims. I am therefore in no position to rule on this issue at this time. *See Floyd v. N.J. Casino Comm'n*, No.

---

[12]     The relevant factors are canvassed and discussed in *Bowers*; *Lane*, 541 U.S. 509 (2004). For certain well-established ADA claims (for example, denial of handicapped-access facilities in courthouses) the relevant analysis has been performed in the case law and enshrined as precedent. *See Lane*, 541 U.S. at 534; *Bowers*, 475 F.3d. at 550-55 (sovereign immunity abrogated in cases involving the denial of access to public education).

05-CV-3949 RMB, 2007 U.S. Dist. LEXIS 44924, 2007 WL 1797656, at *4 (D.N.J. June 19, 2007) (The defendant "has not come close to performing the requisite analysis and, thus, the Court is in no position to make the immunity determination as to Plaintiff's ADA claims at this juncture.")

Jurisdictional issues are, of course, prior to the merits. I do not now, however, call for discovery and resolution of such factual issues on a Rule 12(b)(1) basis. Looking ahead, I will rule that this claim lacks specificity and dismiss it without prejudice for failure to state a claim under the Equal Protection Clause of the Fourteenth Amendment—the best fit for the allegations advanced here—and the ADA. *See* Sections III.A.2.ii., III.C., *infra*. Should the ADA claim be reasserted, the parties should address the Eleventh Amendment issue in their briefs, and the court will take the necessary steps to resolve it.

For now, however, the motion to dismiss the ADA claim (Claim 7) on Eleventh Amendment grounds is DENIED.

## III.    RULE 12(b)(6) ISSUES

As to the claims that have survived the threshold jurisdictional analysis, I proceed to consider the Rule 12(b)(6) motions. Rule 12(b)(6), Fed. R. Civ. P., provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

### A.   Immunity

#### 1.   Absolute Immunity

##### i.   Judges Foti and Mizdol

Judges Foti and Mizdol correctly assert that they are entitled to absolute judicial immunity. As to them, the Rule 12(b)(6) motion to dismiss the complaint on absolute immunity grounds will be GRANTED.

A judicial officer in the performance of his or her duties enjoys absolute immunity from suit. *Mireles v. Waco,* 502 U.S. 9, 12 (1991) Absolute judicial immunity applies to all claims, whether official-capacity or personal-capacity, that are based on judicial acts. *See Dongon v. Banar*, 363 F. App'x 153, 155 ("[J]udges are entitled to absolute immunity from liability based on actions taken in their official judicial capacity.") (3d Cir. 2010) (citing *Briscoe v. LaHue*, 460 U.S. 325, 334 (1983)). "A judge will not be deprived of immunity because the action [s]he took was in error, was done maliciously, or was in excess of [her] authority . . . ." *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978). The immunity is not vitiated by "allegations of malice or corruption of motive." *Gromek v. Maenza*, 614 F. App'x 42, 45 (3d Cir. 2015) (quoting *Gallas v. Supreme Ct. of Pa.*, 211 F.3d 760, 768 (3d Cir. 2000)).

There are two exceptions to absolute judicial immunity: (1) "a judge is not immune from liability for nonjudicial actions"; and (2) "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11. Mazzetti relies on the second exception; he essentially argues that Judges Mizdol and Foti, Superior Court Judges in the Chancery Division, Family Part, had no jurisdiction over his case while the matter of Linda Mazzetti's will was pending in Surrogate Court. That is incorrect.[13] Superior Court judges have original jurisdiction in all causes, including "all controversies respecting wills, trusts, and estates," regardless of division. N.J. Const. Art. VI § 3; N.J. Stat. Ann. § 3B:2-2. The Surrogate Court's jurisdiction, by contrast, is a creature of statute and cannot be "construed in any way to affect, impair or limit the original jurisdiction of the Superior Court given to it by the Constitution." N.J. Stat. Ann. § 3B:2-1. Empowered with original jurisdiction, Judges Mizdol and Foti could have "acted in a manner to defeat" the intent of Linda's will in parallel family court proceedings; indeed, they could have assumed the matter of Linda Mazzetti's will and denied Mazzetti guardianship outright. (Pl. Br. 19-21)

The motion to dismiss the claims against Judges Foti and Mizdol on grounds of absolute judicial immunity, then, is GRANTED.

### ii.    Justice Long

Justice Long, now retired from the New Jersey Supreme Court, is the Chairperson of ACJC. Sued in her personal capacity, she states that she is entitled to absolute judicial immunity under N.J. Ct. R. 2:15-22. Whether under state rules or more general federal immunity principles, Justice Long, as

---

[13]    At any rate, the application of plaintiff's theory to Judge Mizdol is not clear. Judge Mizdol, recall, allegedly terminated Mazzetti's visitation rights months *before* Linda Mazzetti executed the codicil to her will designating her son as D.M.'s guardian. Without legal or factual support, Mazzetti claims that she did so without subject matter or personal jurisdiction. That conclusory allegation is not enough to repel an absolute immunity defense, even at the pleading stage.

a member of the ACJC, is absolutely immune from suit. As to her, the motion to dismiss will be GRANTED.

The first source of absolute immunity is the very Rule of Court by which the ACJC is formed. It confers absolute immunity on its members "for any conduct in the performance of their official duties." N.J. Ct. R. 2:15-22.

The ACJC, whose members are appointed by the New Jersey Supreme Court, sits to perform investigations and hold hearings on misconduct, fitness to serve, and like matters with respect to State Judges. Mazzetti alleges that he petitioned the ACJC to investigate Judge Mizdol. He sues Justice Long as Chairperson, because the ACJC found "no basis to charge Judge Mizdol with judicial misconduct." (Compl. ¶ 156) That determination was plainly within the scope of the ACJC's function, and within the scope of Justice Long's duties as Chairperson. *Campell v. Supreme Ct. of N.J.*, Civ. No. 11-555 ES, 2012 U.S. Dist. LEXIS 41650, at *26-28 (D.N.J. Mar. 27, 2012) (granting immunity based on R. 2:15-22 because "investigating complaints of judicial misconduct . . . encapsulates the essential functions of the ACJC" and "arises out of the performance" of defendants' official duties). Under the State rules creating the ACJC, then, Justice Long is immune.[14]

Even setting aside the applicable New Jersey Court Rule, Justice Long would be entitled to either quasi-judicial or prosecutorial immunity. Public employees "who perform judge-like functions" and whose "role is functionally comparable to that of a judge" are entitled to quasi-judicial immunity. *Ingram v. Twp. of Deptford*, 858 F. Supp. 2d 386, 390 (D.N.J. 2012) (citing *Hamilton v. Leavy*, 322 F.3d 776, 785 (3d Cir. 2003)). "When judicial immunity is extended to officials other than judges, it is because their judgments are 'functionally comparable' to those of judges—that is because they, too, 'exercise a discretionary judgment' as part of their function." *Id.* (quoting *Antoine v. Byers*

---

[14]     *See also Adamo v. Jones*, No. CV 15-1073 (MCA), 2016 WL 356031, at *8–9 (D.N.J. Jan. 29, 2016) (suit against state entities, including ACJC, is in substance a suit against the State of New Jersey, subject to the Eleventh Amendment).

& *Anderson, Inc.*, 508 U.S. 429, 436 (1993)). At the core of the ACJC's functions are the kind of discretionary acts normally performed by a judge or a prosecutor. *See Kwasnik v. LeBlon*, 288 F. App'x 238, 243-44 (3d Cir. 2007); *J.L.D. v. Estate of Gannon*, Civ. No. 15-386, U.S. Dist. LEXIS 100312, at *39-42 (D.N.J. July 29, 2016); *Adamo*, 2016 U.S. Dist. LEXIS 10698, at *8; *Campbell*, U.S. Dist LEXIS 41650, at *30-32. Where, as here, the ACJC investigates but declines to pursue charges against a judge, an ACJC official is entitled to absolute immunity from suit. *Id.*

Justice Long is alleged to have erred in concluding that there was no basis to charge Judge Mizdol with judicial misconduct. But it is the nature of the function, not the rightful or wrongful manner in which it was performed, that governs the immunity inquiry. Whether viewed under N.J. Ct. R. 2:15-22 or more general principles of judicial and prosecutorial immunity, that decision was discretionary and within the scope of Justice Long's official duties. As to Justice Long, then, the motion to dismiss based on absolute immunity is GRANTED.

### iii.    Prosecutor Molinelli

Prosecutor Molinelli asserts the defense of absolute prosecutorial immunity. Prosecutorial immunity erects a liability shield, not unlimited in breadth, but virtually impenetrable. Mazzetti cannot pierce it here.

A prosecutor is immune for all acts that are "intimately associated with the judicial process." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976); *see also Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992). Mazzetti faults Molinelli for failing to prosecute Roberts for her actions during the July 2014 emergency removal of D.M, even though a municipal court judge allegedly found probable cause to issue a criminal complaint. Besides the vague allegation that Molinelli "served as a witness to events set forth in this

Complaint,"[15] there is no indication that Molinelli had participated in, or even had personal knowledge of, D.M.'s emergency removal or any proceedings before the municipal court. Either way, however, there is no doubt that Molinelli's exercise of prosecutorial discretion would be an act closely associated with the judicial system itself. *Kulwicki*, 969 F.2d at 1463-64 (holding that a prosecutor was entitled to absolute immunity even though he allegedly directed a police officer to file baseless charges against the prosecutor's political rival); *see also Schaeffer v. Wilson*, 240 F. App'x 974, 975 (3d Cir. 2007) ("The decision to initiate a prosecution is at the core of a prosecutor's judicial role. . . . And we have found no authority creating a mandatory duty upon [a police officer and district attorney] to investigate and pursue the prosecution of [others].") (citing *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 382 (2d Cir. 1973)). Even assuming *arguendo* that there was probable cause to charge Roberts, then, the Prosecutor's decision to decline criminal prosecution is shielded by absolute immunity.[16] *See Sanders*

---

[15]     An allegation, by the way, that is also levied against Governor Christie, Deputy Attorney General Buckwalter, Prosecutor Molinelli, Judges Mizdol and Foti, and Justice Long.

[16]     In *United States v. Lovasco*, the Supreme Court has explained why the existence of probable cause is a necessary but not sufficient condition for an indictment:

> It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself," *United States v. Ewell*, [383 U.S. 116, 122 (1966)]. From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since, as we recognized in [*United States v. Marion*], a formal accusation may "interfere

*v. Downs*, 420 F. App'x 175, 180 (3d Cir. 2011) ("Sanders' claims against prosecutors . . . necessarily fail because prosecutors enjoy absolute immunity for the failure to adequately investigate a case and for the decision to initiate, or decline to initiate, a prosecution.") (citing *Kulwicki*, 969 F.3d at 1463)).

As to Prosecutor Molinelli, then, the motion to dismiss on the basis of absolute immunity is GRANTED.

### iv.   Deputy Attorney General Buckwalter

DAG Buckwalter also claims that she enjoys quasi-judicial immunity. I agree. The only fact pled as to her is that she acted as the State's attorney in the July 2014 emergency removal proceedings before Judge Mizdol. As noted above, "certain officials 'functioning as integral parts of the judicial process' are absolutely immune from civil suits under § 1983." *Ernst v. Child & Youth Servs* 108 F.3d 486, 494 (3d Cir. 1997) (quoting *McArdle v. Tronetti*, 961 F,2d 1083, 1084 (3d Cir. 1992); *Briscoe v. Lahue*, 460 U.S. 325, 334 (1983) (affirming that, under traditional common law principles, section 1983 does not impose liability "for . . . persons—governmental or otherwise—who [are] integral parts of the judicial process"). Attorneys who assist the state in preparing and prosecuting an emergency removal petition are undoubtedly integral to such proceedings. *See Ernst*, 108 F.3d at 488-89 (holding that attorneys who

---

with the defendant's liberty, . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." 404 U.S. [307,] 320 [(1971)]. From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited. And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts. Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.

431 U.S. 783, 790-792 (1977).

prosecute dependency proceedings on behalf of the state are entitled to absolute immunity); *Mazzetti v. Wood*, 573 F. App'x 165, 167 (3d Cir. 2014) (affirming district court's dismissal of DAG Susan M. Slaff, whom Mazzetti sued in the parallel district court action, on absolute immunity grounds).

In the absence of any other immunity-destroying fact or allegation, the complaint as against Buckwalter is DISMISSED.

### v.   Roberts and Zapata

Mazzetti alleges that Roberts, a DCP&P caseworker, unlawfully seized D.M in July 2014. Zapata, also a DCP&P caseworker, allegedly provided false information to the Child Placement and Review Board ("CPRB") and to a doctor, who as a result improperly prescribed Ritalin for D.M. Roberts and Zapata both claim they are entitled to absolute immunity. At this stage, however, the motion to dismiss cannot be granted on immunity grounds, because further factual development is required.

Absolute immunity "attaches to actions intimately associated with the judicial phases of litigation, but not to administrative or investigatory actions unrelated to initiating and conducting judicial proceedings." *Odd v. Malone*, 538 F.3d 202, 2008 (3d Cir. 2008). A court must therefore perform a "meticulous analysis of [the] actions and functions" of those seeking immunity. *Light v. Haws*, 472 F.3d 74, 79 (3d Cir. 2007); *accord Odd*, 538 F.3d at 208. Under *Ernst v. Child & Youth Servs. of Chester Cty.*, child welfare workers are "entitled to absolute immunity for their actions on behalf of a state in preparing for, initiating, and prosecuting dependency proceedings." 108 F.3d at 495. The key inquiry is whether Zapata or Roberts "functioned as the state's advocate when performing the actions that gave rise to the due process violations [that the plaintiff] seeks to address, or whether those claims instead arose from unprotected administrative or investigatory actions." *B.S. v. Somerset Cty.*, 704 F.3d at 265 (internal quotation marks omitted). As it is the case here, often such an analysis will involve facts beyond the scope of the pleadings.

Mazzetti faults Zapata for acts that occurred *after* the 2011 or 2012 dependency proceedings in which his parental rights were terminated. In 2014, he says, Zapata relayed false information to the CPRB.[17] That same year, Zapata allegedly gave a doctor false information, which led to D.M. being improperly prescribed Ritalin. In either case, the nature of Zapata's acts—whether administrative, investigative, prosecutorial, or something else—are not entirely clear from the face of the complaint. What is clear is that they are not alleged to have been undertaken during the underlying dependency proceeding. Without further development of the factual record, I cannot now say that Zapata is clearly entitled to absolute immunity.

Mazzetti's allegations as to Roberts present a closer call. Reading between the lines of the complaint, I gather that Judge Mizdol allegedly illegally brought about Roberts's emergency removal order of D.M. from Linda Mazzetti's home.[18] If this was done pursuant to an emergent removal order, Roberts could be absolutely immune for any actions she took to obtain that order. *See, e.g. B.S. v. Somerset Cty.*, 704 F.3d at 264-271 (holding that DCP&P

---

[17]   CPRB is a creature of the New Jersey court system. *See* www.judiciary.state.nj.us/volunteer/vs_cprb.html. No party has addressed whether proceedings before the CPRB are merely administrative, or whether they are an extension of the dependency or other judicial proceedings.

[18]   Or perhaps Mazzetti is alleging that the order was not issued at all. In his motion papers, Mazzetti contends that the emergency removal of D.M. was done without a court order. (Def. Br. 23) The complaint, however, seems to imply, without actually stating, that the removal was authorized by an ex parte order issued by Judge Mizdol. (*See* Compl. ¶¶ 124) ("On Tuesday, July 1, the DYFS, without notice to his family, and without any allegations of child abuse or neglect, seized D.M. . . . with the aid of Elmwood Park Police Department, who came in armed with the threat of force and several patrol cars that lit up the entire neighborhood."); 125 ("When asked why she was there, caseworker Kimberly Roberts only indicated that she had been before Honorable Bonnie Mizdol . . . earlier that day, but refused to provide any paperwork or explanation for her conduct."); 129 ("DYFS, aided and abetted by Ellen Buckwalter, D.A.G., claimed in its Verified Complaint . . . that Linda Mazzetti, the child's paternal grandmother and adoptive mother, was "no longer able to care for [D.M.] due to her hospitalization."); 132 ("Judge Mizdol furthered fabrication of DYFS' justification for the emergent removal stating that "Ms. Mazzetti told the Division worker that she did not have the energy or ability to care for [D.M.] anymore as he was such an active [child].""))

caseworkers were absolutely immune for actions taken in seeking a court order transferring custody from one parent to another). She could also be absolutely immune for any actions taken to implement such an order. *Hamilton v. Leavy*, 332 F.3d 776, 782-83 (3d Cir. 2003) ("[A]ction taken pursuant to a facially valid court order receives absolute immunity from § 1983 lawsuits for damages.") Missing from the record, however, is the order (if it exists), or facts about the process by which it was obtained (if it was). So I do not have the facts before me to perform the necessary absolute immunity analysis.

The motion to dismiss on absolute immunity grounds as to Zapata and Roberts is therefore DENIED. Because I am mindful that issues of immunity should be resolved as early as possible, I will grant leave for defendant Roberts or Zapata to file an early summary judgment motion once any necessary discovery has been had.

### 2. Qualified Immunity

Zapata and Roberts alternatively argue that they are entitled to qualified immunity. Governor Christie joins in this argument. Qualified immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To overcome qualified immunity, a plaintiff must plead facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735. The Court has discretion to analyze the steps in either order. *Pearson*, at 236 (partially overruling *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and no longer requiring courts to determine issues (1) and (2) in that order).

As to Governor Christie, I find that the complaint fails to allege sufficient facts to make out a violation of any federal constitutional right. With respect to Zapata and Roberts, the complaint also fails to allege sufficient facts to make a violation of a constitutional right, except as to the First Amendment retaliation claim. My findings as to that first qualified immunity prong is really no different from finding, under the usual Rule 12(b)(6) standard, that the complaint does not sufficiently allege a constitutional cause of action as a matter of law.

### i.   Governor Christie

As against Governor Christie, Mazzetti alleges violations of the First, Fourth, Sixth, Eighth, and Fourteenth Amendments. The only fact alleged to Governor Christie is that he failed or refused to investigate DCP&P and impeach Judge Mizdol. Mazzetti, however, has not cited to any legal authority suggesting the Constitution obligated the governor to investigate his grievances on command. To the contrary, Mazzetti has no legally cognizable interest in compelling an executive branch official to investigate or prosecute others for the alleged violation of his rights. *See Aruanno v. Fishman*, 443 F. App'x 679, 680-81 (3d Cir. 2011) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.") (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)); *Sanders*, 420 F. App'x at 180 (same); *Wise v. Augustine*, Civ. No. 97-2651, 1997 U.S. Dist. LEXIS 12350, at *7 (E.D. Pa. Aug. 8, 1997) ("A private citizen has no constitutional, statutory, or common law right to require a public official to investigate or prosecute a crime.").

Mazzetti's claim that the Constitution required Governor Christie to impeach Judge Mizdol requires no analysis; there simply is no such requirement. The Governor's failure to institute impeachment proceedings violated no Constitutional command at all, let alone a clearly established one. The motion to dismiss Counts 3, 4, 5, and 6 against Governor Christie on qualified immunity grounds is GRANTED.

### ii.    Zapata and Roberts

Mazzetti alleges that Zapata and Roberts, too, violated his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. Defendants argue that Mazzetti's "conclusory, formulaic, and bare" allegations are not entitled to the presumption of truth. For the most part, I agree; as to the First Amendment, however, a claim has been stated.

**First Amendment Retaliation:** The First Amendment retaliation claim against Zapata and Roberts is essentially a recasting of the claims already discussed. *See* Section III.A.1.v, *supra*. Mazzetti alleges that Roberts illegally took D.M. from Linda Mazzetti's home in July 2014, and that Zapata made false statements to the CPRB and a doctor, who improperly prescribed D.M. Ritalin. He generally avers that these actions were taken in retaliation for his lawsuits against DCP&P, as well as his attempt to instigate investigations into DCP&P practices.

"In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary fitness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). The first element is a matter of law; the second two are questions of fact. *See Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). Filing a civil rights lawsuit is protected conduct, satisfying the first element. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). The parties have not briefed the fact-sensitive second and third elements of Mazzetti's First Amendment retaliation claim, nor the fact-intensive "clearly established" step in the qualified immunity analysis.[19] For these reasons, the motion to dismiss

---

[19]    I do note, however, that Zapata and Roberts are not defendants in Mazzetti's parallel civil rights lawsuit.

Mazzetti's Section 1983 claim under First Amendment on qualified immunity grounds is DENIED.

That said, I will grant the motion on qualified immunity grounds as to Mazzetti's other constitutional claims. Even a cursory review of the applicable law demonstrates that these claims cannot be sustained.

**Fourth Amendment:** Mazzetti repeatedly quotes the Fourth Amendment as stating that no person shall "be deprived of life, liberty, or property, without due process of law." Presumably he intended to refer to the Fifth or Fourteenth Amendment, not the Fourth Amendment, which prohibits unreasonable searches and seizures. The Fifth Amendment claim is analyzed separately below. No Fourth Amendment claim is stated. Mazzetti's section 1983 claim under the Fourth Amendment is DISMISSED.

**Fifth/Fourteenth Amendments**: Mazzetti says that he has been deprived of life, liberty, and property without due process of law, in violation of the Fifth Amendment. (Because Roberts and Zapata are state, not federal, officials, the Fourteenth Amendment may have been intended.)

As to Roberts, I interpret this as a claim that Mazzetti was deprived of his legal rights without procedural due process when D.M. was removed from Linda Mazzetti's home, allegedly without a proper court order or without any order at all. The problem with this claim is that Mazzetti had no rights with respect to D.M. at the time D.M. was taken from Linda Mazzetti's home. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (holding that a court must consider "the private interest affected by the official action"). Whether with or without due process, he was not deprived of anything to which he had a right or entitlement. As to Zapata, the due process claim has a similar fundamental flaw: Zapata's alleged wrongdoing occurred long after Mazzetti's parental rights had been terminated.

Mazzetti's section 1983 procedural due process claim is therefore DISMISSED.

**Sixth Amendment:** Mazzetti inexplicably claims violations of his Sixth Amendment rights. Those would consist of the rights to a speedy and public trial; to an impartial jury; to be informed of the accusations against him; to confront the witnesses against him; to subpoena favorable witnesses; and to have the assistance of counsel in his defense. U.S. Const. Amend. VI. These are rights afforded to defendants in criminal prosecutions. This is not a criminal prosecution, and the underlying termination proceedings were not criminal prosecutions.[20] Mazzetti's section 1983 claim under the Sixth Amendment is DISMISSED.

**Eighth Amendment:** Mazzetti next contends that his Eighth Amendment right to be free of cruel and unusual punishment has been violated. The right to the companionship, care, custody, and management of a biological child is a precious one that commands respect. State-initiated termination proceedings, however, are not a "punishment," but an effort to secure and advance the best interests of the child. Mazzetti has offered no authority for the proposition that the Eighth Amendment applies in such a situation. Nor has he identified which, if any, of the actions of Zapata or Roberts constitute cruel and unusual punishment. Accordingly, the section 1983 claim under the Eighth Amendment is DISMISSED.

**Equal Protection:** Mazzetti claims his Fourteenth Amendment right to equal protection has been violated. Equal Protection claims come in two basic varieties: "(1) [the plaintiff] is a member of a protected class similarly situated to members of an unprotected class and was treated differently from

---

[20]     Mazzetti might be trying to say that he was not afforded the assistance of counsel, or received ineffective assistance of counsel, during the underlying termination proceedings. (*See, e.g.,* Compl. ¶ 53) Although New Jersey has granted indigent parents in state-initiated termination proceedings the right to counsel, *see* N.J. Stat. Ann. 30:4C-15.4(a), federal law provides no such guarantee. *See Lassiter v. Dep't of Social Servs.*, 42 U.S. 18 (1981). At any rate, however, Mazzetti has not explained how these particular defendants deprived him of whatever right to counsel he may have had. A defendant's personal involvement is an essential ingredient of a civil rights claim under section 1983. *Gittlemacker v. Prasse*, 428 F.2d 1, 3 (3d Cir. 1970).

the unprotected class; or (2) he belongs to a 'class of one' and was intentionally treated differently from others similarly situated without any rational basis." *Mayer v. Gottheiner*, 382 F. Supp. 2d. 635, 651 (D.N.J. 2005) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) and *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)). Mazzetti fails to state a claim under the first theory because he has not alleged that he is a member of a protected class.[21] He fares no better under the second, because there are no allegations that any defendant, let alone Zapata or Roberts, intentionally treated him differently from others similarly situated without a rational basis. *See Phillips v. Cty. Of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008). Nor are there any specific allegations as to what services or accommodations others similarly situated received that Mazzetti did not. (Compl. ¶¶ 76, 280-81) Mazzetti's section 1983 Equal Protection Clause claim is therefore DISMISSED.

**Substantive Due Process:** Mazzetti contends that Zapata and Roberts arbitrarily interfered with his rights as the parent of D.M., in violation of the Due Process Clause of the Fourteenth Amendment. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000). The right he claims is the right to be free from State interference with his parental relation with D.M., "unless [the State] has some reasonable and articulable evidence giving rise to a reasonable suspicion that child has been abused or is in imminent danger of abuse." *See Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997).

Once again, however, the claims against all other defendants have been dismissed on grounds of jurisdiction and immunity. The actions of the remaining defendants, Roberts and Zapata, took place long *after* Mazzetti's parental rights with respect to D.M. had been terminated. He had no right—let alone a clearly established right—at that time to be free from interference in his

---

[21]    He alleges equivocally that his medical condition "may" have rendered him permanently disabled. (Compl. ¶ 66) Illness or disability, however, is not a suspect classification. *Bd. of Trs. of. Univ. of Al. v. Garrett*, 531 U.S. 356, 366-67 (2001).

relationship with D.M., because, as a matter of law, there no longer was any such relationship. The substantive due process claim is therefore DISMISSED.

### B.  § 1985 (Count 3)

Mazzetti alleges that there is a conspiracy to deprive him of his civil rights pursuant to 42 U.S.C. § 1985. To bring a claim under that section 1985, a plaintiff must show: "'(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citing *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)). Mazzetti generally avers that defendants "reached a meeting of the minds amongst themselves that incidents of abuse of process would be tolerated notwithstanding the constitutional implications of such abuse and the likelihood such conduct would be repeated." (Compl. ¶ 249) The specifics about the formation of that agreement are not stated.[22] There are no allegations concerning any sort of racial or class-based animus, or really any identifiable class. *See Farber*, 440 F.3d at 135. Mazzetti himself does not allege that he is part of a protected class, or that he was denied equal protection of the law because of his class membership. The section 1985 conspiracy claim is therefore DISMISSED.[23]

---

[22]    Considering this exact allegation, Judge Wolfson cogently observed that no abuse of process claim exists under section 1985, which prohibits conspiracies to violate federal civil rights, not to commit state law torts. *See Mammaro v. N.J. Div. of Child Permanency & Prot.*, 2015 U.S. Dist. LEXIS 5321, at *27-28 (D.N.J. Jan. 15, 2015), *rev'd on other grounds*, 814 F.3d 164 (3d Cir. 2016).

[23]    Mazzetti also brings a claim under section 1986 in Count 2, which I have already dismissed for lack of standing as to the injunctive relief sought. Even if the section 1986 claim had sought damages, however, I would dismiss it. A cause of action under section 1986 is dependent on whether there is a conspiracy under section 1985. *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994). I have dismissed the section 1985 claim.

### C.   ADA Claim (Count 7)

Mazzetti's last claim for damages is asserted under Title II of the ADA. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Because the Eleventh Amendment immunity question cannot be resolved on the present record, this claim was not dismissed on jurisdictional grounds. *See* Section II.C.2, *supra*. It nevertheless must be dismissed for failure to state a claim.

The individual defendants, sued in their individual capacities, are not "public entities," and therefore are not eligible defendants. *See Bowens v. Wetzel*, No. 16-3036, 2017 U.S. App. LEXIS 92, at *3-4 (3d Cir. Jan. 4, 2017); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc). As against any individual defendant, the Title II claim must be dismissed.

Beyond that, Mazzetti has not clearly alleged that he is a qualified individual with a disability, or that he was denied specific services, programs, or activities because of his hernia condition. There is in fact no allegation that he is actually disabled—only that he "may" be. Nor is there any clear allegation that he was denied any services because of a disability. (Compl. ¶ 64-68, 76). Nor is there any factual, non-speculative allegation that his parental rights were terminated because of a disability. (*See id.* ¶¶ 281-284).

For these reasons, Mazzetti has failed to state a claim under the ADA. As to all defendants, the motion to dismiss Count 7 is GRANTED.

## IV.   HABEAS CORPUS

The final count of the complaint, Count 8, is a habeas corpus petition under 28 U.S.C. § 2254. Defendants contend that because termination of parental rights and placement of a child in foster care is not "custody" within the meaning of section 2254, the Court is without jurisdiction to entertain the petition. *See Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502

(1982). To get out from under *Lehman*, Mazzetti argues that he brings the petition as D.M.'s "next friend" under *Whitmore v. Arkansas*, 495 U.S. 149, 163-74 (1990). The custody and next friend issues are intertwined, but the analysis is mostly controlled by *Lehman*. The upshot is that I do not have the statutory jurisdiction to entertain the habeas claim in Count 8.

Under Section 2254, a district court has jurisdiction to hear a petition on behalf of an individual who is "in custody pursuant to a judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Generally, the "custody" requirement is met where the petitioner is subject to "significant restraints on liberty . . . which were not shared by the public generally, along with some type of continuing governmental supervision." *Obado v. New Jersey*, 328 F.3d 716, 717 (3d Cir. 2003) (quoting *Barry v. Bergen Cty. Prob. Dep't.* 128 F.3d 152, 160 (3d Cir. 1997)). But children who are placed with a foster parent pursuant to a court order "are not in the 'custody' of the State in the sense in which that term has been used by [the Supreme Court] in determining the availability of the writ of habeas corpus." *Lehman*, 458 U.S. at 510. That is because "they are in the 'custody' of their foster parents in essentially the same way, and to the same extent, other children are in the custody of their natural or adoptive parents." *Id.* at 510-11. In short, the term "custody" is a miscue; it does not mean the same thing for purposes of family law and habeas law.

Mazzetti's response—that he has standing to pursue a habeas petition as D.M.'s "next friend"—is something of a *non sequitur*. Since Linda Mazzetti's death, D.M. has been under the care of a foster parent. (Compl. ¶¶ 164, 223, 289) D.M. himself is not in custody, and has no right to bring a habeas petition. It follows that Mazzetti can have no greater right to bring a petition on D.M.'s behalf. Under *Lehman*, this Court cannot hear a habeas petition challenging that placement, which does not qualify as "custody" under 28

U.S.C. § 2254.[24] The complaint, to be sure, alleges that D.M. has suffered side effects from taking Ritalin and that D.M would rather live with his natural father. These are not insignificant restraints on D.M.'s liberty—but they are not any more significant than those imposed on children of adoptive or natural parents. *Id.* at 510-11; *see also Obado*, 328 F.3d at 717. Foster parents, like adoptive parents or natural parents, have the power and duty to decide whether the benefits of placing a child on prescription medication outweigh the side effects. And Mazzetti's parental rights, it must be remembered, have been terminated; D.M., a child, has no greater right to live with Mazzetti than he does with any other person he might select. In other words, D.M. "suffer[s] no unusual restraints not imposed on other children." *Lehman*, at 510-11.

Mazzetti, though he tries to talk around it, really stands in the shoes of the petitioner in *Lehman*. Like that petitioner, Mazzetti seeks "to relitigate, through federal habeas, not any liberty interest of [D.M.], but the interest in [his] own parental rights." *Id.* at 511; *see also Lehman v. Lycoming Cty. Children's Servs.*, 648 F.2d 135, 140 (3d Cir. 1981) (en banc) (the Court of Appeals decision affirmed by the Supreme Court in *Lehman, supra*) ("[U]nlawful custody is simply not the issue in a parental rights termination case. It is not the liberty interest of the children that is sought to be protected in such a case, but only the right of the particular parent to raise them."). Under the law of this Circuit and the Supreme Court, this district court has no statutory basis to hear what amounts to a collateral challenge to the state court order terminating Mazzetti's rights.

---

[24] *Lehman* left open the possibility that habeas relief might be possible "when a child is actually confined in a state institution rather than being at liberty in the custody of a foster parent pursuant to a court order." *Lehman*, at 511 n.12. Mazzetti alleges that "D.M. has been held in custody of DYFS, as a Ward of the State of New Jersey, in violation of the Constitution for the United States of America since July 1, 2014." (Compl. ¶ 289) Not the same thing. That argument was advanced by Justice Blackmun. *Id* at 522 ("I have difficulty finding that minor children, who as state wards are fully subject to state-court custody orders, are not sufficiently and peculiarly restrained to be deemed 'in custody' for the purposes of the habeas corpus statute.") (Blackmun, J.) (dissenting)). It was rejected, however, by six other Justices.

Even if the "custody" requirement were met, however, I would still decline to hear a habeas petition brought by Mazzetti as D.M.'s "next friend." The "next friend has [the] burden to establish why [the] real party in interest cannot prosecute a habeas petition, that [the] 'next friend' is 'truly dedicated' to the best interests on whose behalf she litigates, and that she has some significant relationship with real party in interest." *Amerson v. Iowa Dep't of Human Servs. v. Palmer*, 59 F.3d 92, 93 n.3 (8th Cir. 1995) (citing *Whitmore*, 495 U.S. at 163-64). Granting that D.M. is a minor and that Mazzetti is his biological father, I still have serious doubts that Mazzetti's interests in this litigation are aligned with D.M.'s interests. My reasons are substantially the same as those detailed in Part II.A.2: that Mazzetti has been adjudicated unfit to make decisions in D.M.'s interests; that returning D.M. to Mazzetti's custody may not be in D.M.'s best interest; and that D.M. has a legal guardian who possesses the legal authority to make decisions in D.M.'s best interests.

Finally, even assuming that Mazzetti could proceed as D.M.'s next friend, the claims he asserts here do not actually involve the liberty interests of D.M. *See Lehman*, 458 U.S. at 511-12 ("[F]ederal habeas has never been available to challenge parental rights or child custody."); *Amerson*, 59 F.3d 93 ("Jurisdiction over a habeas petition brought by a next friend exists only if the litigation actually involves the concerns of the real party in interest and simply the grievances of the next friend.") *Id.* at 93. The complaint largely seeks relief for Mazzetti's primary grievance: the allegedly wrongful termination of his parental rights. Virtually all of its allegations center around the actions and processes that led to that termination. Federal habeas is not a vehicle for Mazzetti to relitigate those grievances.

The request for habeas corpus is therefore DENIED WITH PREJUDICE.

## V.      CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss is GRANTED in part and DENIED in part, as follows.

1. Because amendment would be futile, the following are DISMISSED WITH PREJUDICE:

- Counts 1 and 2, for lack of standing;
- Counts 3, 4, 5, and 6 against defendant DCP&P, on sovereign immunity grounds;
- Counts 3, 4, 5, and 6, against defendants Governor Christie, Judge Foti, Judge Mizdol, Deputy Attorney Buckwalter, Justice Long, and Prosecutor Molinelli, on sovereign immunity and absolute immunity grounds or qualified immunity grounds;
- Counts 4 and 5 against defendants Roberts and Zapata, on qualified immunity grounds; and
- Count 8, for lack of habeas jurisdiction.

2.      The following are DISMISSED WITHOUT PREJUDICE:

- Count 3, against Roberts and Zapata, for failure to state a claim; and
- Count 7, for failure to state a claim.

3.      The motion to dismiss Count 6 (First Amendment retaliation) as to defendants Roberts and Zapata is DENIED.

A separate ORDER will issue.

Dated: March 27, 2017

**KEVIN MCNULTY**
**United States District Judge**

40