**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DENNIS MAZZETTI, individually and on behalf of D.M. as the "next friend" of D.M. a minor,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**THE NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY ("DCP&P") (formerly Division of Youth and Family Services), et al.,**<br><br>    **Defendants.** | Civ. No. 14-8134 (KM) (MAH)<br><br>**OPINION** |

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

Plaintiff Dennis Mazzetti brings this action alleging a bevy of constitutional violations committed during the process of terminating his parental rights over his child, D.M., and later, when the child was in the custody of Mazzetti's mother. This matter comes before the court on a motion for summary judgment filed by defendants Kimberly Roberts and Erica Zapata. (DE 42). For the reasons set forth below, the motion will be GRANTED.

I.    **Background[1]**

A.    **The Parties**

The relevant figures in this action are Mazzetti; his mother, Linda; his brothers, Dennis and Daniel; his child, D.M.; the child's mother, C.H.; and

---

[1]    Certain key items from the record will be abbreviated as follows:

| | | |
|---|---|---|
| DE __ | = | Docket entry number in this case |
| Compl. | = | Complaint and jury demand (DE 1) |
| Ex. __ | = | Exhibits filed within DE 42 and DE 60 |
| Ex. A | = | Order to Show Cause, Signed by Judge Bonnie Mizdol (DE 60-1) |

D.M's half-sister C.M. Defendants Roberts and Zapata are employees of the New Jersey Department of Child Protection and Permanency ("DCP&P").

### B. Facts

D.M. was born on March 11, 2007 to Mazzetti and C.H. (DE 56 ¶ 1). He was born with cocaine in his system and, following his release from the hospital, he was placed in a foster home. (DE 56 ¶¶ 2–3). A few months later, Mazzetti's mother, Linda, agreed to care for D.M. and D.M. was placed in her home. (DE 56 ¶ 6). Linda eventually adopted D.M. (DE 56 ¶ 6).[2]

At some point, DCP&P sought to terminate Mazzetti's parental rights based on the best interests of the child. (DE 56 ¶ 8). Mazzetti could not provide for D.M. without assistance from Linda. During the termination proceedings, DCP&P workers testified that he "failed . . . to plan for [D.M.'s] future" and "abandoned his minor child to the care of others." (Compl. ¶¶ 64–68, 73, 76, 79–84).

Mazzetti's rights over D.M. were terminated by the Family Part of the New Jersey Superior Court. (DE 56 ¶ 9). He appealed, and in January 2012 the Appellate Division of the New Jersey Superior Court affirmed the trial court's denial of Mazzetti's parental rights:

> We only briefly observe with regard to these two prongs that the record abundantly demonstrated that defendant failed to obtain or maintain stable employment and was unable or unwilling to secure adequate housing for the child. He refused for several months to comply with the Division's reasonable request and the trial court's order that he submit to hair follicle drug testing even when his

| | | |
|---|---|---|
| Ex. B | = | Best Interest Evaluation by Ada Liberant, Psy.D. (DE 60-2) |
| Ex. C | = | Forensic Evaluation by Barry Katz, Ph.D. (DE 60-3) |
| Ex. D | = | Letter from Brett Biller, Psy.D. (DE 60-4) |
| Ex. E | = | Evaluation of Attachment by Kathleen Krol, Ph.D. (DE 60-5) |
| Ex. F | = | Deposition of Dennis Mazzetti (DE 42-4) |
| Ex. G | = | Deposition of Kimberly Roberts (DE 42-4) |
| Ex. H | = | Deposition of Erica Zapata (DE 42-4) |

[2]   C.M. voluntarily relinquished her parental rights. (DE 56 ¶ 7).

right to visitation hung in the balance.[2] In addition, the judge relied on the Division's expert, Dr. Alice S. Nadelman, who concluded that defendant would "not be physically or psychologically able to take care of his son for the foreseeable future." Indeed, defendant's own expert, Dr. Marc Friedman, reached a similar conclusion, expressing an opinion that he did "not believe [defendant] has the maturity or judgment to raise a child." In his thorough findings of fact, the trial judge properly reached the conclusion that these circumstances clearly and convincingly demonstrated that defendant had exposed the child to a substantial risk of harm and defendant was unable or unwilling to eliminate that harm.[3]

. . .

[fn. 2] When defendant finally submitted to hair follicle drug testing months after it was sought, he tested positive for cocaine.

. . .

[fn. 3] Defendant also contends the Division failed to make reasonable efforts to provide services to him. We find this argument to be meritless. *R.* 2:11–3(e)(1)(E). The Division provided a psychological evaluation, parenting classes and substance abuse treatment. Services were offered to assist defendant in obtaining housing and employment. That these efforts largely failed to bear fruit is not the test. Indeed, defendant alone stood in the way of his obtaining employment or a suitable home, making it clear to the Division's caseworker that he "could get his own work when he chose to," and that he had funds available to secure housing.

*New Jersey Div. of Youth & Family Servs. v. D.M.*, No. A-2509-09T3, 2012 WL 127437 at *2 & nn.2 & 3 (N.J. Super. Ct. App. Div. Jan. 18, 2012) (citing *In re Guardianship of D.M.H.*, 161 N.J. 365, 393 (1999); *see also* DE 56 ¶ 10.)

Mazzetti sought and was denied review first from the New Jersey Supreme Court and then from the Supreme Court of the United States. *See N.J. Dep't of Children and Families, Div. of Youth and Family Servs. v. D.M.*, 210 N.J. 218 (May 9, 2012); *D.M. v. N.J. Dep't of Youth & Family Servs.*, 133 S. Ct. 571 (Oct. 29, 2012). In the interim, on August 23, 2012, Mazzetti filed a federal court complaint that substantially overlaps the subject matter of this action.[3]

---

[3]    That case, *Mazzetti v. New Jersey Division of Child Protection Permanency*, Civ. No. 12-5347, was assigned to a different judge in this district. There too, Mazzetti sued

(DE 56 ¶ 13). Mazzetti's filing of that case, *Mazzetti v. New Jersey Division of Child Protection Permanency*, Civ. No. 12-5347 (D.N.J.), is claimed here to be the basis for defendants' alleged acts of retaliation.

On or about March 7, 2014, Linda was hospitalized. (DE 56 ¶ 10). While Linda was in the hospital, D.M. remained—as Linda intended—in the care of his uncle, David. (Ex. A at 3). On June 23, David was hospitalized and tested positive for opiates, PCP, benzodiazepines, and amphetamines. (Ex. A at 3). At that time, Mazzetti and his other brother Daniel acted as primary caretakers for D.M. and his older sister. (Ex. C at 6). On July 1, 2014, David returned home. (Ex. A at 3). According to a later court order, at this point "[t]here were continued concerns about substance abuse and parenting ability" of all three brothers. (Ex. C at 6; *see also* Ex. A at 3). Because of these concerns, a local DCP&P office manager decided to remove D.M. from Linda's care. (Ex. G 34:1–6).

On July 1, 2014, DCP&P caseworker Kimberly Roberts conducted an emergency removal of D.M. from Linda's home. (I further discuss Roberts's involvement below.)

On July 3, 2014, Hon. Bonnie Mizdol, Presiding Judge of the Bergen County Family Part, held a hearing on an Order to Show Cause with Temporary Custody and Appointment of a Law Guardian. (Ex. A). Mazzetti's brother David attended in person and Linda appeared by telephone. (Ex. A). Finding it to be in D.M.'s best interest, Judge Mizdol terminated Mazzetti's visitation rights. (Ex. A). D.M was placed back into foster care. (Ex. B).

Judge Mizdol found as follows:

---

a host of New Jersey officials and DCP&P, alleging that they violated his rights during the termination proceeding. *See Mazzetti v. Wood*, 573 F. App'x 165, 166 (3d Cir. 2014). The trial court judge dismissed the case on *Rooker-Feldman* grounds, but the Third Circuit vacated that decision, instructing the district court to consider *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163 (3d Cir. 2010). *See* 573 F. App'x at 166–67. On remand, Mazzetti filed an amended complaint, withdrew the complaint, and moved to disqualify the judge. There has been no subsequent activity in that case. *See* Docket, Civ. No. 12-5347 (D.N.J).

The Division was granted custody of [C.M.] on September 19, 2005 after it was confirmed that [C.H.] and Mr. Daniel Mazzetti were drug involved and [C.M.] witnessed acts of domestic violence between [C.H.] and Mr. Mazzetti. On June 8, 2006, [C.M.] was returned to [C.H.] after she successfully engaged in drug treatment, counseling and parenting classes. Mr. Mazzetti continued to be drug involved and tested positive for cocaine on numerous occasions. On March 11. 2007, Ms. Demeter gave birth to [D.M.]. [C.H.] and [D.M.] tested positive for cocaine the day of his birth. [C.H.] admitted she used a bag of cocaine on March 10, 2007. On September 27, 2007, the Division filed for Guardianship of [C.M.] due to [C.H.]'s history of substance abuse and domestic violence and Mr. Mazzetti's ongoing substance abuse problems and psychiatric instability. In July of 2008, the Division filed for Guardianship of [D.M.] due to [C.H.]'s history of substance abuse and domestic violence and continued affiliation with Daniel and Dennis Mazzetti which caused the Center for Evaluation and Counseling to consider [C.H.] to be a high risk for relapse. Additionally, Dennis Mazzetti failed to cooperate with court ordered services and failed to obtain and maintain stable housing for him and [D.M.] to be apart from [C.H.] and Mr. Daniel Mazzetti. On August 5, 2009, [C.M.] Kinship Legal Guardianship with Linda Mazzetti was finalized. On May 31, 2013, [D.M.]'s adoption with Linda Mazzetti was finalized.

On March 7, 2014, Linda Mazzetti was hospitalized after 7 year-old [D.M.] pushed-her down while throwing a tantrum and she broke her vertebrae. Ms. Mazzetti has suffered several falls since then and has not been able to be out of the hospital since this time. On June 30, 2014, Ms. Mazzetti told the Division worker she did not have the energy or the ability to care for [D.M.] anymore as he was such an active [sic].

On June 23, 2014, [D.M.]'s paternal uncle, David Mazzetti, who had been [C.M.] and [D.M.]'s primary caregiver since Ms. Mazzetti was hospitalized, checked himself into the hospital for shortness of breath and chest pains and tested positive for opiates, PCP, benzodiazepines, and amphetamines. While both Linda Mazzetti and David Mazzetti were hospitalized, Mr. Daniel Mazzetti, whose child was in Kinship Legal Guardianship, and Dennis Mazzetti, whose parental rights of his child had been terminated, were acting as [D.M.] and [C.M.]'s primary caregivers. On July 1, 2014, David Mazzetti was released from the hospital and returned home. The

> Division worker spoke to Linda Mazzetti who indicated that it was
> her plan for David Mazzetti to be the primary caretaker for Cecilia
> and Daniel until she could return home. In addition to positive
> drug screens, when the Division workers spoke with Mr. Mazzetti
> on July 1, 2014, he appeared sweaty, pale, and fragile.

(Ex. A at 1–2). Judge Mizdol determined that the D.M.'s removal had been
necessary based on an imminent danger to his life, safety, or health. (Ex. A at
2). She granted Linda and David simultaneous visitation rights twice a week for
eight hours at a time. (Ex. A at 4). The order also makes clear that "[n]either
Dennis Mazzetti nor [C.H.] shall have visitation with 7 yr old [D.M.]."

### Kimberly Roberts's Involvement

As noted above, on July 1, 2014, DCP&P caseworker Kimberly Roberts
conducted an emergency removal of D.M. from Linda's home.[4] (DE 56 ¶ 30).
The removal was based on information provided by Deputy Attorney General
Ellen Buckwalter, who, in a verified complaint, stated that Linda "was 'no
longer able to care for [D.M.] due to her hospitalization." (Compl. ¶¶ 125-129,
134, 143; see also DE 60-3 at 6.).

Roberts testified that at this time she was not aware that Mazzetti was
the plaintiff in a pending federal lawsuit against DCP&P. (Ex. G 38:5–15).[5]
Indeed, Roberts's entire involvement in the case lasted only about two months
(Ex. G 38:16–19), and she did not learn of the lawsuit until after her
involvement had ended (Ex. G 38:12–15). During his deposition, Mazzetti
conceded that he had no direct evidence that Roberts knew of his lawsuit:

> Q. Okay. Going back to Miss Roberts, did she, at any time,
> specifically discuss with you the complaints, any complaints?
> A. No.

---

[4]    During the removal, Roberts made physical contact with Mazzetti's brother
Daniel. The parties agree that Daniel was struck by the car door as Roberts closed it,
but dispute whether it was intentional. (Ex. G, 49:18-50:18). The Elmwood Park
Municipal Court later found probable cause to issue a criminal complaint, but the
Bergen County Prosecutor declined to prosecute Roberts. (Ex. G 69:18-73:3).

[5]    Mazzetti does not dispute her statement but states that "it is self-serving and
not credible." (DE 56 ¶ 28).

> Q. Okay. And she was never a defendant in any of your court
> filings . . . prior to this, correct?
> A. That's correct.

(Ex. F 91:21–92:4. *See also* Ex. G 90:21–92:4 (Roberts not named as defendant in Mazzetti's federal action).).

As noted above, the emergency removal was ratified by order of Judge Mizdol two days later, on July 3, 2014.

### Erica Zapata's Involvement

During late summer or early fall 2014, and while still hospitalized, Linda executed a codicil to her will in which she appointed her son (Dennis, the plaintiff here) as D.M.'s guardian. (Ex. G 75:14-19). Linda then died and D.M remained in foster care. (Ex. B). At some time later in 2014, D.M.'s case with DCP&P was reassigned to Zapata. (Ex. H 15:24-16:13). After his mother's death, Mazzetti tried to regain custody of his son. (Ex. H 32:9-21).

All the while, Mazzetti's first federal lawsuit remained pending. Like Roberts, Zapata was not a defendant in that action. (Ex. G 90:11–23).

While Mazzetti sought custody of his son, DCP&P continued to provide Mazzetti certain services. These included substance abuse evaluations, psychological and psychiatric examinations, visits with his son, parenting classes, and a bus pass. (Ex. H 32:15–25; DE 56 ¶ 66). Zapata continued to work with both Mazzetti and D.M. (Ex. H 33:1–34:12).

At the behest of DCP&P, psychologist Dr. Barry Katz evaluated Mazzetti, C.H., and D.M on several occasions. (Ex. C at 1). Those sessions were intended as forensic evaluations to determine the best interest of D.M. and assess the parenting capacity of Mazzetti and C.H. (*Id.* at 1, 17).

Zapata's duties caused her, on several occasions, to cross paths with Dr. Katz. (Ex. H 33:6–35:2). Mazzetti alleges that during these interactions Zapata tried to poison Dr. Katz's opinion of him (DE 56 ¶ 40), portraying Mazzetti as a drug user and manipulator:

> [I]t was [DCP&P]'s mind to tell [Dr.] Katz, which gave him a
> negative opinion on me to begin with, and then his lies during his
> testimony that basically opened this all up.

(Ex. F 77:12–15). However, during his deposition, Mazzetti was at best
equivocal about the grounds for his accusation that Zapata had undermined
him with Dr. Katz:

> Q. Okay. How do you know that Ms. Zapata . . . talked to Dr. Katz?
> A. Dr. Katz told me
> Q. What did he tell you?
> A. Zapata told me that I was a drug addict, that I was gonna
> manipulate and lie and try to manipulate him or the way he feels
> about me.
> Q. And did [Dr. Katz] tell you that [Zapata] saying this to him gave
> him an understanding, a false understanding of you?
> A. No, he did not tell me that.
> Q. Okay.
> A. He didn't have to.

(Ex. F 85:1–15). The upshot of this quoted material seems to be that Mazzetti
believed Zapata thought poorly of him and assumed she must have shared that
opinion with Dr. Katz, but that Katz himself never acknowledged having had
such a conversation.

Against this equivocal account is the direct evidence of Zapata. According
to her deposition testimony, her communications with Dr. Katz on the subject
of Mazzetti consisted of the following: She faxed to Dr. Katz a case history that
included a PROMIS/gavel report, a CIC check, the history of the case, the
reasons for DCP&P's involvement, and the court orders. (Ex. H 33:19:23). Dr.
Katz, for his part, corroborated Zapata's testimony that she provided him with
these documents. (Ex. C. at 19). And when asked if Dr. Katz told "the judge
that Miss Zapata had made representations to him prior to meeting" with him,
Mazzetti testified that "[n]o, he did not." (Ex. F 88:1–4).

Zapata also spoke to Dr. Katz to schedule an appointment for D.M. (Ex.
H 34:1–24). Zapata drove D.M. to the appointment, and there spoke to Dr. Katz
about D.M.'s wellbeing, but she did not then mention Mazzetti's alleged drug

problem or ability to care for D.M. (Ex. H 34:1–24). Dr. Katz ultimately recommended that C.H. have full custody of D.M. and that Mazzetti complete a psychiatric evaluation, obtain stable and appropriate housing and income, complete a parenting course, and have limited supervised visitation until all requirements were completed. (Ex. C at 28–29).

According to Zapata, she was not aware that Mazzetti had filed a lawsuit against her employer. (Ex. H 20:12–20; 42:16–22). Mazzetti, on the other hand, maintains that Zapata's actions can only be explained if "[DPP&P was] retaliating against . . . Mazzetti for his ongoing Civil Rights action against it." (DE 56 ¶ 40). Mazzetti conceded that he had no direct support for his claim that Zapata knew about the lawsuit.

> Q. Did [Zapata] ever give you any indication that she knew about that lawsuit?
> A. I -- I -- I didn't make anything a secret to anybody, so I'm sure everybody in the [DCP&P] office knew me from 2007 till now.
> Q. Okay. Did she ever bring it up to you specifically?
> A. No, she did not.
> Q. Okay. Did she ever discuss with you any of the other court filings?
> A. No.
> Q. Okay.
> A. Not that I know of.
> Q. Okay.
> A. Or remember.
> Q. Is there anything else that you are alleging that Miss Zapata did?
> A. No.

(Ex. F 91:1–18). Indeed, Zapata testified that any pending lawsuits would have had no influence over the way she handled the matter of D.M.'s custody. (Ex. H 51:24–25; 52:1–2). According to her, DCP&P's only goal was D.M.'s wellbeing and perhaps reunification with his birth parents. (Ex. H 52:3–6). Mazzetti says this statement is "contrary to the record in this case." (DE 56 ¶ 67).

D.M. now resides with C.H., his biological mother. (DE 56 ¶ 68; Ex H 52:3-10). Mazzetti objects to the characterization of this as "reunification." (*Id.*).

## C. Procedural History

Mazzetti filed this action on December 31, 2014.[6] The essence of his complaint in its original form was that defendants denied him his parental rights and retaliated against him for persisting in his appeals and federal civil rights lawsuits. Mazzetti averred that his case represented but one facet of a DCP&P-spearheaded scheme "to place children in foster homes to obtain more funding from the State and the United States Department of Health and Human Services" and "to increase DYFS instigated adoptions." (Compl. ¶¶ 210, 230–92).

The complaint contained eight counts:

1. Section 1983 claim of violations of the Fourth and Fourteenth Amendments by DCP&P, Von Pier, Blake, Judge Mizdol, Judge Foti, and Governor Christie, for failure to properly promulgate rules and to supervise, train, and discipline those who committed abuses of process during their investigation of allegations of child abuse.

2. Section 1983 and 1986 claims of violations of the Sixth and Fourteenth Amendments by the defendants named in Count 1 for a policy or custom of improper hiring and inadequate training that led to abuses of process and deliberate indifference to the rights of persons including Mazzetti.

---

[6]     Mazzetti's complaint named eleven defendants: (1) DCP&P (formerly Division of Youth & Family Services ("DYFS"), a New Jersey child protection and welfare agency within the Department of Children and Families; (2) Governor Christopher J. Christie in his individual and official capacities; (3) Lisa Von Pier in her official capacity as Director of DCP&P; (4) Allison Blake, the Commissioner of the Department of Children and Families, in her individual and official capacities; (5) Judge Bonnie J. Mizdol, the presiding judge of the family division for the Bergen County Vicinage of the New Jersey Superior Court, in her individual and official capacities; (6) Judge Margaret Foti, a judge of the family division for the Bergen County Vicinage of the New Jersey Superior Court, in her individual and official capacities; (7) the Honorable Virginia Long, former Associate Justice of the New Jersey Supreme Court, in her individual and official capacities; (8) Deputy Attorney General Ellen Buckwalter in her individual capacity; (9) Bergen County Prosecutor John Molinelli in his individual and official capacity; (10) Kimberly Roberts, a caseworker at DCP&P, in her individual capacity; and (11) Erica Zapata, a caseworker at DC&P, in her individual capacity. Roberts and Zapata are the only remaining defendants.

3. Section 1985 claim of conspiracy by DCP&P, Governor Christie, Judges Mizdol and Foti, Deputy Attorney General Buckwalter, Roberts, Zapata, Justice Long, and Prosecutor Molinelli to commit abuses of process.

4. Section 1983 claim by the defendants named in Count 3 for violations of Mazzetti and D.M.'s rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments for policies, practices, acts, and omissions that excessively interfered with Mazzetti's fundamental rights to privacy and freedom to raise a family.

5. Section 1983 claim by the same defendants named in Count 3 for violations of Mazzetti and D.M.'s rights under the First, Fourth, Sixth, Eighth, and Fourteenth Amendments for depriving Mazzetti of his due process rights, his rights to be free from excessive interference with family relationships, and his rights to speak freely about the defendants' conduct.

6. Section 1983 claim by the defendants named in Count 3 for violations of Mazzetti and D.M.'s rights under the First and Fourteenth Amendments for retaliating against Mazzetti's opposition to defendants' unlawful conduct and depriving him of equal protection of the law.

7. Claim of violations of Mazzetti's rights under Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131–12165, by the defendants named in Count 3 for failing to provide Mazzetti with services to protect his rights and using his disability as a means to deprive him of those rights.

8. A habeas corpus petition under 28 U.S.C.§ 2254. Mazzetti demanded that defendants either demonstrate lawful jurisdiction and custody over D.M or return D.M. to his custody.

On April 1, 2015, defendants moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. That motion asserted lack of jurisdiction, immunity as to various defendants, and failure to state a claim.

On March 27, 2017, I granted in part and denied in part that motion to dismiss. Specifically, I dismissed with prejudice the following:

- Counts 1 and 2, for lack of standing;

- Counts 3, 4, 5, and 6 against defendant DCP&P, on sovereign immunity grounds;
- Counts 3, 4, 5, and 6, against defendants Governor Christie, Judge Foti, Judge Mizdol, Deputy Attorney Buckwalter, Justice Long, and Prosecutor Molinelli, on sovereign immunity and absolute immunity or qualified immunity grounds;
- Counts 4 and 5 against defendants Roberts and Zapata, on qualified immunity grounds; and
- Count 8, for lack of habeas jurisdiction.

I dismissed without prejudice the following:

- Count 3, against Roberts and Zapata, for failure to state a claim; and
- Count 7, for failure to state a claim.

Because the parties did not brief several fact-sensitive elements of Mazzetti's First Amendment retaliation claim and the qualified immunity defense, I denied the motion to dismiss with respect to Count 6 (First Amendment retaliation) as to defendants Roberts and Zapata.

The only remaining claims concern events that occurred starting when Linda was hospitalized and D.M was removed from her home. The only remaining defendants, Roberts and Zapata, had no involvement in the case before then. Mazzetti's sole surviving claim alleges that Roberts and Zapata, angered by his earlier lawsuit against DCP&P, retaliated against him in connection with the emergency removal of D.M. on July 1, 2014, and his loss of custody of D.M.

## II.   Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In

deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## III.   Discussion

### A. First Amendment Retaliation

The First Amendment retaliation claim against Zapata and Roberts recasts many of the claims dismissed earlier in this lawsuit. Mazzetti alleges that Roberts illegally took D.M. from Linda's home in July 2014, and that Zapata made false statements to the Child Protection Review Board and to Dr. Barry Katz, the doctor who evaluated him and C.H. and D.M. He generally avers that these actions were taken in retaliation for his lawsuits against DCP&P, as well as his attempt to instigate investigations into DCP&P practices.

The First Amendment enshrines the right of the people to petition the government for redress of grievances. U.S. CONST. amend I. When that right is infringed upon by state—as opposed to federal—officials, Section 1983 of the Civil Rights Act of 1871 provides a remedy:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

"In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary fitness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). The first element is a matter of law; the second two are

14

questions of fact. *See Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001).

Mazzetti asserts a claim of First Amendment retaliation:

> Defendants' conduct in threatening to remove D.M. from the care of his family and place him with a stranger foster family if [he] continue[d] to pursue his rights against [DCP&P] was done solely in retaliation for Plaintiff's exercise of his rights to due process and his First Amendment rights in communicating seeking investigation of Defendants' actions.

(DE 1 ¶273). Specifically, Mazzetti continues, Roberts and Zapata punished him for seeking relief in court. Finally, he alleges that Roberts and Zapata willfully and purposely acted with the specific intent of depriving him of his rights.

Filing a civil rights lawsuit is constitutionally protected conduct, easily satisfying the first element. *See Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). Interference with a parent's custody of a minor child is certainly enough to deter a person of ordinary firmness from exercising his constitutional rights, satisfying the second element. Thus the viability of Mazzetti's case turns on his satisfaction of the third element. To survive summary judgment he must demonstrate a causal link between his lawsuit and the defendants' allegedly retaliatory removal of D.M from Linda's home. It is with respect to the third element of the retaliation claim—*i.e.*, a causal link between the plaintiff's constitutionally protected conduct and the state employees' actions—that the problem arises.

As evidence of a causal, retaliatory link, Mazzetti points to his own deposition testimony. During the emergency removal, he says, Roberts told him that "[s]he's DYFS, she could do what she wants, there's nothing [he] could do about it. If [he] keep[t] it up, [he would] never see [D.M] again." (Ex. F 71:6–9). These statements, if they occurred, might be regarded as threatening or unprofessional, but they give no indication that Roberts knew about or was acting in retaliation for a lawsuit.

Mazzetti's opposition brief does little to add content to these assertions. He merely states in conclusory terms that Zapata and Roberts must have known about his lawsuit:

> While Zapata and Roberts have denied knowledge of Dennis Mazzetti's federal lawsuit, this is not credible. Dennis Mazzetti's lawsuit had received media coverage and involved the same DCP&P office in which Zapata and Roberts worked. No reasonable explanation was given for the continued violation of Dennis Mazzetti's Constitutional Rights by Zapata and Roberts, and they were clearly a result of retaliatory conduct.

(DE 57 at 9).

However, the DCP&P local office manager—not Roberts or Zapata—ordered D.M.'s removal from Linda's home. And two days later, at the Order to Show Cause hearing, Judge Mizdol of the Family Part found that the removal had been justified and necessary. There is no evidence—nor does Mazzetti now allege—that Judge Mizdol was aware of his ongoing lawsuit when she issued the ruling.[7] To the contrary, Judge Mizdol's findings of fact demonstrate that, far from being retaliatory, her ruling and DCP&P's removal were justified responses to Mazzetti's inability to care for his young child.

For that matter, even if Roberts or Zapata had been a decisionmaker, the evidence in the record does not create a genuine dispute of material fact as to whether Roberts's removal of D.M. from Linda's home was done for retaliatory reasons. Nor does it show that Zapata took any retaliatory action. Each testified that she did not know about Mazzetti's lawsuit until after the allegedly retaliatory conduct took place. Mazzetti acknowledged under oath that Zapata

---

[7]    At this point, Mazzetti no longer had any legal parental rights to D.M. as those rights had been terminated in a 2012 proceeding before a different Family Part judge. The July 2014 hearing before Judge Mizdol concerned the custody rights of Linda and, by proxy, David, whom Linda had designated as D.M.'s primary caretaker in her absence.

   However, by the time the hearing took place, Linda had already informed DCP&P that she did not have the energy or ability to care for D.M. and David had recently tested positive for a several controlled substances and was himself only several days removed from a hospital stay.

and Roberts never indicated that they had any knowledge of the lawsuit. Mazzetti offers only that the press coverage of his lawsuit must have alerted them both to its existence. (The record, by the way, contains no evidence of such coverage.) Such generalities are insufficient to create a genuine dispute for trial.

Mazzetti offers more generally, and unconvincingly, that Roberts and Zapata's actions must have been retaliatory because there is no other way to explain them. (*See* DE 56 ¶ 40; *see also* DE 57 at 9 (there was "no explanation" for the removal of D.M.)). The evidence is all to the contrary; they had ample reason to act as they did in removing D.M. from the home.

I will nevertheless go a step farther and assume *arguendo,* contrary to the evidence, that Roberts and Zapata were the relevant decisionmakers and that there is evidence that they knew about the lawsuit. Even so, summary judgment in their favor would be appropriate, because the non-retaliatory basis for defendants' actions, based on the best interest of D.M., is manifest. "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). *A fortiori*, a defendant may defeat the claim by demonstrating that *someone else* was responsible for the alleged retaliatory actions, based on an independent evidentiary record.

Such an independent evidentiary record exists here. At the time of the 2014 removal, Mazzetti's parental rights had been terminated two years earlier, in 2012, by a trial court judge. In that earlier proceeding, a different DCP&P worker testified that Mazzetti had failed to plan for D.M.'s future despite his physical and financial ability and that he had abandoned D.M. to the care of others.

Immediately after the 2014 removal, Judge Mizdol ruled that D.M.'s removal had been necessary for his wellbeing. At this hearing, Roberts was present (though Zapata was not). The hearing was also attended by a law

guardian, Deputy Attorney General Buckwalter, Linda, David, and C.H.'s attorney. Roberts could not have unilaterally influenced the judge's ruling even if she had wanted to. Indeed, Judge Mizdol's findings make clear that the removal was justified. The order noted that Mazzetti tested positive for cocaine on numerous occasions and that he had a history of psychiatric instability. He had repeatedly failed to cooperate with court-ordered services and failed to obtain and maintain stable housing for himself and D.M. Judge Mizdol's findings are clear that neither Mazzetti nor his brothers could maintain a stable home environment for D.M. In short, it is not necessary to posit retaliation as a basis for removal of D.M.

As an alternative to direct evidence of a causal link, a plaintiff can rely on circumstantial evidence that a defendant's acts were inspired by a retaliatory motive. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). Such indirect evidence may consist of either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* Thus, where the timing alone is not "unusually suggestive" of retaliatory motive, the plaintiff must set forth other evidence to establish a causal link. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997).

Here, Mazzetti has not shown temporal proximity. Indeed, Roberts's and Zapata's allegedly retaliatory conduct occurred years after Mazzetti filed his lawsuit against the agency (although not against them).[8] Nor has he shown antagonism coupled with other evidence of a causal link. Here, too, the claim runs up against the fact that the relevant decision makers were the state court system and Roberts's local office manager. DCP&P and the Family Part acted based on, *inter alia,* evaluations by mental health professionals. Rather than suggesting a pattern of antagonism, the record indicates a continued effort by DCP&P to reunite D.M. with his biological parents, Mazzetti and C.H. For example, DCP&P provided Mazzetti with substance abuse evaluations,

---

8    The lawsuit was concededly still pending, however.

psychological and psychiatric evaluations, visits with his son, parenting classes, and a bus pass. Consequently—even if defendants had possessed knowledge of the lawsuit and made the relevant decisions—Mazzetti's proof of a causal link between his lawsuit and the denial of his parental rights would fail.

Consider also the circumstances of the removal itself. At the time, the evidence reveals, D.M.'s three potential caretakers were Mazzetti—whose rights had been terminated; Mazzetti's brother Daniel—whose own child was in kinship legal guardianship; and David—who had days earlier tested positive for opiates, PCP, benzodiazepines, and amphetamines. It simply cannot be said that these circumstances compel or even suggest an inference that "retaliation" must have been the basis for the removal.

For all of these reasons, I will grant summary judgment in favor of defendants on plaintiff's First Amendment retaliation claim.

### B. Qualified Immunity

Even if Mazzetti's First Amendment retaliation claim were meritorious, Roberts and Zapata would be entitled to qualified immunity.

Qualified immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To overcome qualified immunity, a plaintiff must plead facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735. The Court has discretion to analyze the steps in either order. *Pearson*, at 236 (partially overruling *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and no longer requiring courts to determine issues (1) and (2) in that order).

The doctrine exists to shield government officials performing discretionary functions "from civil damages liability as long as their actions

could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  In other words, the immunity grants officials "breathing room to make reasonable but mistaken judgments about open legal questions," thereby protecting "all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

An official's conduct "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (citations omitted).  To determine the "contours" of the right at issue, the *al-Kidd* Court held that absent "controlling authority," "robust consensus of cases of persuasive authority" must have placed the statutory or constitutional question confronting the officials "beyond debate." *Id.* at 741–42. In this regard, the Court has repeatedly cautioned lower courts "not to define clearly established law at a high level of generality . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (citations and internal quotations omitted). Consistent with this admonition, the Supreme Court has recently devoted much attention to the "clearly established" prong of the qualified immunity analysis and has reversed several lower courts that either distilled a "clearly established" right from inapposite precedent, or defined the right too generally to place government officials on sufficient notice. *See City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015); *Taylor v. Barkes*, 135 S. Ct. 2042 (2015); *Carroll v. Carman*, 135 S. Ct. 348 (2014); *Plumhoff*, 572 U.S. 765; *Stanton v. Sims*, 571 U.S. 3 (2013); *Reichle v. Howards*, 566 U.S. 658 (2012); *al-Kidd*, 563 U.S. 731 (2011). To overcome qualified immunity *the plaintiff* bears the burden of showing both that her constitutional rights were violated, and that the rights violated were clearly established. *Mammaro v. N.J. Div. of Child Protection & Permanency*, 814 F.3d 164, 168–69 (3d Cir. 2016).

In the context of First Amendment retaliation, qualified immunity depends on "whether officials reasonably could believe that their motives were proper even when their motivations were in fact retaliatory." *Larson v. Senate of Commonwealth*, 154 F.3d 82, 94 (1998). This type of inquiry ordinarily cannot be determined on the face of the pleadings and can only be resolved after factual inquiry. *Id.*

Here, we have a full factual record. Roberts and Zapata are entitled to qualified immunity because the evidence produced during discovery shows that they could have reasonably believed that their motives were proper. Equally important, Mazzetti's discovery materials yielded no evidence that moved the needle in his favor. Instead, his claim relies on allegations that merely restate the conclusory assertions in his complaint and carry no evidentiary weight.

### 1. **Kimberly Roberts**

Mazzetti alleges that Roberts retaliated against him by executing the emergency removal of D.M. after Linda could no longer care for him. To the contrary however, after receiving D.M.'s case, Roberts met with her supervisor and local office manager, who then issued the decision to remove D.M. from Linda's care. Roberts did not make that decision.

Here, I repeat that at the time of the removal, D.M.'s three potential caretakers were Mazzetti—whose parental rights had been terminated; Mazzetti's brother Daniel—whose own child was in kinship legal guardianship; and David—who had days earlier tested positive for opiates, PCP, benzodiazepines, and amphetamines. In such circumstances, Roberts reasonably believed that both her motives and her actions were professional and proper.

Roberts testified that at the time the decision was made to remove D.M., she was not aware that Mazzetti had pending a federal civil rights suit against DCP&P. Moreover, Roberts did not learn of the lawsuit until after her involvement in the case—which in any event, lasted only approximately sixty days. Finally, at the order to show cause hearing, the Family Part held that that D.M.'s removal was necessary to avoid an ongoing risk to his life, safety, or

health. The court's affirmance of the emergency removal only underscores that Roberts, who is neither a lawyer nor a judge, could have believed that her motives were proper and justified. She is thus entitled to summary judgment on the qualified immunity issue.

### 2. Erica Zapata

Mazzetti contends that Zapata told Dr. Katz that Mazzetti was a drug addict who would try to manipulate him and lie to him. He claims that Katz acknowledged this in a conversation.

Zapata testified that she merely provided Dr. Katz with the case history by faxing the file to him and otherwise had little contact with him. Indeed, she spoke to him on the phone only to schedule D.M.'s appointment. Afterward she and Dr. Katz briefly discussed D.M.'s condition in-person when she dropped D.M. off for his. Dr. Katz's report corroborates this account: "DCPP provided background information."[9]

In short, the evidence adduced during discovery does not advance Mazzetti's assertion that Zapata acted in a manner that was clearly out of bounds, as required by the qualified-immunity standard. In fact, it does the opposite. Like Roberts, Zapata testified that she was unaware of the lawsuit pending against DCP&P and that even if she had known about it, it would have had no influence over her conduct. Thus, whether it occurred or not, her alleged statement of opinion to Dr. Katz (a) could not have been *retaliatory* (the claim here) and (b) could reasonably have been seen as part of her duty to furnish relevant information to Dr. Katz.

Nor did Zapata demonstrate a malign or retaliatory motive in any other way. She concededly furnished social services to Mazzetti and C.H., placing both in a stronger position to regain custody of D.M. Indeed, DCP&P's stated

---

[9]     The background information included a PROMIS/gavel report on Mazzetti, a CIC check, the history of the case, the reasons for DCP&P's involvement, and the court orders. This information was thus relevant and truthful, not defamatory. Furnishing such background information was surely reasonably perceived by Zapata to be within the scope of her lawful duties.

goal of reunification was ultimately achieved; D.M. now resides with his mother, C.H.

This record clearly establishes that Zapata reasonably believed she was acting properly (and indeed was acting properly) and is thus entitled to summary judgment on the qualified immunity issue.

## IV.    Conclusion

For the reasons set forth above, I will GRANT defendants' motion for summary judgment on behalf of Kimberly Roberts and Erica Zapata.

An appropriate order follows.


Dated: September 4, 2019        .


                                    _____
                                    **Hon. Kevin McNulty**
                                    **United States District Judge**